# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 28, 2020

Lyle W. Cayce
Clerk

No. 20-10162

BNSF Railway Company; Kansas City Southern Railroad
Company; CSX Transportation, Incorporated; Grand
Trunk Western Railroad Company; Norfolk Southern
Railway Company; Illinois Central Railroad Company;
Union Pacific Railroad Company; Belt Railway
Company of Chicago,

*Plaintiffs—Appellees*,

*versus*

International Association of Sheet Metal, Air, Rail
and Transportation Workers - Transportation
Division,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:19-CV-789

Before Smith, Higginson, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

This appeal arises out of a railway labor dispute between Plaintiffs, a
group of railroad companies (collectively, "the Railroads"), and Defendant,
International Association of Sheet Metal, Air, Rail, and Transportation

No. 20-10162

Workers-Transportation Division ("SMART-TD"), a labor organization that represents the Railroads' employees who are employed in the craft and/or class of train service. This dispute began—as so many other railway labor disputes have—when the Railroads proposed new and streamlined procedures for the operation of the train, and SMART-TD pumped the brakes on their progress. Despite its familiar origins, however, this case presents novel questions regarding a court's authority to intervene in a railway labor dispute. Specifically, we consider whether the district court properly issued an injunction requiring SMART-TD to bargain on the Railroads' proposal. We vacate and remand.

I.

In anticipation of the November 1, 2019 opening of a new round of collective bargaining, the Railroads sent a letter to SMART-TD's President, notifying the union that the Railroads intended to seek changes in crew consist. It suffices to say that crew consist, the number of workers manning a train, has been a topic of fierce debate between the parties over the decades.[1] Crew consists in the early 1900s comprised as many as ten workers. But with the advent of various technological advances, fewer employees were required to operate a train, and the Railroads progressively sought to reduce crew size.[2] Invoking safety and efficiency concerns, SMART-TD and its predecessors resisted these proposals tooth and nail. Despite their best efforts, the current typical crew consist has been reduced to just one or two employees.

---

[1] For a complete recitation of the storied history of crew consist, *see Bhd. of R. R. Trainmen v. Akron & B. B. R. Co.*, 385 F.2d 581, 588-92 (D.C. Cir. 1967).

[2] For example, when diesel fueled trains became ubiquitous in the 1960s, railroad companies sought to reduce crew consist by eliminating firemen—an obsolete position left over from the days of steam powered trains.

No. 20-10162

In exchange for reduced crew sizes, the Railroads offered unions certain benefits, including special allowance payments, a "productivity fund," and a guarantee that crew size would only be reduced through a process of "pure attrition." "Pure attrition" means that the positions would be eliminated only as the employees who held those positions died, retired, or voluntarily terminated their employment, rather than eliminating the positions through furloughs or layoffs. Because crew size is negotiated on a local basis,[3] there are a total of 45 distinct collective bargaining agreements ("CBA") between SMART-TD and the Railroads. Most of these CBAs contain a moratorium provision, which bars the parties from making proposals to change "specific provisions" in the agreement until all employees who were working as of the date of the agreement have left via attrition.

Of the 45 CBAs, 31 have a "standard" moratorium, which generally provides:

> The parties to this Agreement shall not serve or progress, prior to the attrition of all protected employees, any notice or proposal for changing the specific provisions of this Agreement governing pure attrition, car limits and train lengths, special allowance payment to reduced crew members, employee productivity fund deposits and the administration thereof.

Seven of the CBAs have a moratorium provision that does not track this standard language. These moratoria read:

---

[3] SMART-TD has a three-tiered structure: (1) the International, which functions as the administrative head, (2) General Committees of Adjustment ("GCA"), which are semi-autonomous mid-level bodies that are responsible for negotiating and enforcing their respective collective-bargaining agreements, and (3) locals, where membership is held. Crew consists are customarily bargained at the GCA level.

> The parties to this agreement shall not serve or progress, prior to the attrition of all protected employees, any notice or proposal for changing the crew size and or productivity fund provided for in this agreement. As it pertains to this Article, protected employees are Trainmen with a seniority date as of July 28, 2003.

The remaining seven either have no moratorium provision or one that has expired.

The meaning of these provisions lies at the heart of this dispute. According to SMART-TD,

> The purpose of these agreements was to regulate crew size and how crew size would be reduced. Crews could only be reduced by "pure attrition," *i.e.*, only when those employees voluntarily left their positions. The moratoria bar proposals on crew size until the last protected employee left. There is no dispute that protected employees are still employed.

In sum, SMART-TD takes the position that the Railroads are not permitted to request any changes in crew consist until the last protected employee under the moratorium has voluntarily left the position. Therefore, when the Railroads sent notice that they were seeking to change crew consist—while protected persons were still employed—SMART-TD refused to negotiate.

Unsurprisingly, the Railroads disagree about the meaning of the standard moratorium.[4] They have interpreted it as a protection to

> [P]revent renegotiation of the quid pro quos given to employees in exchange for the last round of crew size reductions. Most, if not all, of the modern moratoriums were based on the "Milwaukee Road" agreement, which provided

---

[4] As to the non-standard agreements, the Railroads served different Section 6 proposals seeking only the redeployment of existing crews, without any reduction in the size or consist of the crews.

various benefits to employees, such as special allowances, productivity funds, furlough protections, limits on train lengths, and the like.  It is those employee benefits – not new changes in "crew consist" – that are the subject of the moratoriums.

According to the Railroads, after SMART-TD was served with notice regarding crew consist proposals, collective bargaining was required under the applicable provisions of the Rail Labor Act ("RLA").  45 U.S.C. § 152, *et seq.*

Accordingly, given this impasse, the Railroads served their complaint on SMART-TD on October 25, 2019, alleging that its refusal to bargain over crew consist violated the RLA.  On November 7, the Railroads moved for a preliminary injunction that would require SMART-TD to begin negotiating over the crew consist proposals.  The district court held a hearing on December 19, during which the Railroads requested that the court convert its preliminary injunction to a permanent one, should the court find in its favor.  The court did just that in an order on February 11, 2020.  Namely, it permanently enjoined SMART-TD (1) "from refusing and/or failing to bargain in good faith with each of the Railroads over the November 2019 Crew Consist Proposals in the manner required by the RLA"; and (2) "from refusing and/or failing to bargain in good faith with the multi-carrier group of Railroads with respect to the Railroads' November 2019 Alternative Wage Proposal."  SMART-TD timely appealed, and we granted its motion to expedite the appeal.

No. 20-10162

## II.

A trial court's grant of a permanent injunction[5] is reviewed for abuse of discretion. *State v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 413 (5th Cir. 2020), *as revised* (Apr. 3, 2020). The district court abuses its discretion if it "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018). The district court's order is entitled to deference, but we review de novo any questions of law underlying the decision. *Ysleta*, 955 F.3d at 413.

## III.

The parties' entitlement, and the court's authority, to issue an injunction depend upon the type of dispute the court was presiding over, so we must first decide whether the district court properly classified the present dispute. We hold that it did, but that does not end the analysis. We must also determine if the injunction it issued was a proper remedy considering the type of dispute present. We hold that it was not.

---

[5] There are four traditional criteria considered by the district court in deciding whether the movant is entitled to an injunction: (1) irreparable injury; (2) substantial likelihood of success on the merits; (3) a favorable balance of hardships; and (4) no "disserv[ice]" to the public interest. *See Plains Cotton Co-op. Ass'n v. Goodpasture Comput. Serv., Inc.*, 807 F.2d 1256, 1259 (5th Cir. 1987); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985). "The district court's determinations as to each of the elements required for a preliminary injunction are mixed questions of fact and law, the facts of which we leave undisturbed unless clearly erroneous." *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1462 (5th Cir. 1990).

### A. Classifying the dispute

The RLA, enacted in 1926, was "an agreement worked out between management and labor, and ratified by the Congress and the President." *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 576 (1971). The "heart" of the RLA is the duty imposed by 45 U.S.C. § 152, First upon management and labor

> [T]o exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

*Chicago & N. W. Ry. Co.*, 402 U.S. at 574.  To effectuate peaceful dispute resolution, the RLA sets out a mandatory and "virtually endless" process of "negotiation, mediation, voluntary arbitration, and conciliation." *Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987).

Specifically, the RLA delineates two tracks of resolution, depending upon whether the dispute is "major" or "minor." *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302–04 (1989) ("*Conrail*").  A dispute is "major" where a party seeks new agreement terms "affecting rates of pay, rules, or working conditions."   45 U.S.C. § 152, Seventh; § 156.  Major disputes "relate[] to . . . the formation of collective agreements or efforts to secure them." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945), *adhered to on reh'g*, 327 U.S. 661 (1946).  Therefore, in a major dispute the "issue is not whether an existing agreement controls the controversy" or an "assertion of rights claimed to have vested in the past" but "[t]hey look to the acquisition of rights for the future." *Id.*

To initiate the major dispute procedures under Section 156 of the RLA, a party must first serve a Section 6 notice of the proposed changes.  45

U.S.C. § 156.  Within thirty days after the notice is served, the parties are obligated to begin "conferences."  *Id.*  If no agreement can be reached voluntarily through negotiation, "[m]ajor disputes go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration; and finally[,] to possible presidential intervention to secure adjustment."  *Elgin*, 325 U.S. at 725 (internal quotations and citations omitted).  During the pendency of a major dispute, "the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions."  *Conrail,* 491 U.S. at 302–03.  Finally, it is only once "this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force," such as striking.  *Id.* at 303.

Minor disputes, on the other hand, "contemplate[] the existence of a collective agreement already concluded" and "relate[] either to the meaning or proper application of a particular provision."  *Elgin*, 325 U.S. at 723.  Thus, a proposed action creates a minor dispute "if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major."  *Conrail,* 491 U.S. at 307.  A party faces a "relatively light burden" to show that a dispute is minor, *id.*, and "if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor."  *Ry. Labor Execs. Ass'n v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987).

In Section 153, the RLA provides a more streamlined process for minor disputes.  *See Elgin*, 325 U.S. at 727–28.  After failed negotiation, "[a] minor dispute . . . is subject to compulsory and binding arbitration before the National Railroad Adjustment Board . . . or before an adjustment board established by the employer and the unions representing the employees."  *Conrail,* 491 U.S. at 303–04 (citing 45 U.S.C. § 153).  Striking and other self-

help tactics arising out of minor disputes are prohibited. *Id.* at 304. And, in a minor dispute, a party is permitted to move unilaterally on its "own interpretation of the agreement pending exhaustion of arbitration." *Int'l Bhd. of Teamsters v. Sw. Airlines*, 875 F.2d 1129, 1133 (5th Cir. 1989) ("*Teamsters*") (en banc); *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989) ("The status quo provisions of the RLA generally do not apply in minor disputes, enabling the carrier to act on its own interpretation pending arbitration.").

SMART-TD and the Railroads disagree not only about how to classify the dispute but are also at loggerheads about how many disputes are present. We agree with the Railroads that there are two interrelated, but distinct, disputes. The first—what we will call the "moratorium dispute"—involves interpreting the moratorium to determine whether the Railroads are permitted to propose changes in crew consist before covered employees have voluntarily left their employment. The second—the "crew consist dispute"—is the more substantive dispute regarding how many employees will be required to man a train in the future. Classifying these disputes elucidates their differences.

Turning first to the moratorium dispute. This dispute is minor if the Railroads' interpretation—that the moratoria permitted the Section 6 proposals on crew consist—is arguably covered by the provision, or if it is not fictitious or merely colorable. *See St. Louis Sw. Ry. Co. v. United Transp. Union*, 646 F.2d 230, 233 (5th Cir. Unit A May 1981) ("*UTU*"). The district court found "the Railroads have met the 'relatively light burden' necessary to show that their interpretations of the CBAs are arguably justified such that the instant dispute is a minor one." We agree. The standard moratorium provisions specifically preclude bargaining over "pure attrition, car limits and train lengths, special allowance payment to reduced crew members, [and] employee productivity fund deposits." The plain language of these

moratoria does not explicitly preclude bargaining over crew consist, providing—at a minimum—a non-fictitious argument that Section 6 crew consist proposals are permissible.[6, 7]

In fact, out of the 45 CBAs at issue, 31 contain the moratorium that does not specifically list "crew consist" as one of the topics that is off limits for bargaining. SMART-TD concedes as much but maintains that "[t]hose words did not have to appear because the very essence of these agreements [was] about crew size, as noted by the title of the articles themselves." That may well be true. Regardless, SMART-TD's argument only confirms that this dispute "may be conclusively resolved by interpreting the existing agreement," which is "[t]he distinguishing feature of" a minor dispute. *Conrail*, 491 U.S. at 305.

---

[6] This court, and others, have similarly found disputes over moratoria to be minor. *See, e.g.*, *UTU*, 646 F.2d at 233; *CSX Transp., Inc. v. United Transp. Union*, 395 F.3d 365, 368 (6th Cir. 2005) ("We have previously held that a dispute over whether a moratorium provision can be interpreted to bar the serving of Section 6 notices is a minor dispute[.]"); *Burlington N. Inc. v. R.R. Yardmasters of Am.*, No. 76 C 1750, 1976 WL 1570, at *3 (N.D. Ill. June 21, 1976).

[7] Further supporting the Railroads' interpretation is that seven of the CBAs *do* include moratorium provisions that specifically preclude negotiating crew consist. *See* supra at § I. This evidence tends to show that SMART-TD intended to protect crew consist in those seven moratoria, but not the others. *See Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529, 542 (6th Cir. 2017) ("A claim is 'arguably justified' if any reasonable labor arbitrator, applying appropriate principles of contract interpretation . . . could find that the contract *does justify* a party's claimed right to take . . . an action.").

Because we have found the existing moratorium arguably allows the Railroads to serve their Section 6 crew consist notices, this dispute is distinguishable from *Atlas*, which SMART-TD relies on, and which was "*not* a case about whether the existing CBA arguably permits" an action. *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1110 (D.C. Cir. 2019) (emphasis added).

Because the moratorium dispute is minor and negotiations have failed, it is subject to "compulsory and binding arbitration before the National Railroad Adjustment Board . . . or before an adjustment board established by the employer and the unions representing the employees." *Id.* at 303–04. The board will conclusively determine whose interpretation of the moratorium prevails and, consequently, whether SMART-TD is required to bargain crew consist.

Indeed, if the board finds that proposals to change crew consist are permitted, that dispute must be bargained because the crew consist dispute is major. This is because changing crew consist involves amending the existing CBAs.[8] *Atlas*, 928 F.3d at 1109 ("A dispute over the terms of a new or amended collective bargaining agreement is unequivocally major."). Before these changes can be implemented, the parties must go through the "lengthy process of bargaining and mediation" imposed by Section 156 of the RLA, and if those procedures fail, the dispute will become subject to self-help measures. *Conrail,* 491 U.S. at 302.

As presented, this case could involve two disputes: a minor dispute involving the interpretation of the moratoria and a major dispute over amending the CBAs to change crew consist. *See UTU*, 646 F.2d at 232 (finding that the railroad and union had "both a major and a minor dispute or a dispute having both major and minor aspects"). This distinction matters not only because it directs the disputes down different paths of resolution, but also because a court's authority to issue an injunction depends, in part, upon the type of dispute it is presiding over.

---

[8] Changing crew consist is routinely found to be a major dispute. *See, e.g., Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, 789 F.3d 681, 693 (6th Cir. 2015); *Burlington N. R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1274–75 (7th Cir. 1988).

### B. Authority to issue an injunction under the RLA

Generally speaking, a court's jurisdiction in a labor dispute is limited to preserving and enforcing the RLA's dispute resolution procedures. There are only three scenarios contemplated by the RLA that could have justified the injunction, here.

First, a court has authority to issue an injunction in a minor dispute, but only in "exceptional circumstances." *Allied Pilots Ass'n v. Am. Airlines, Inc.*, 898 F.2d 462, 465 (5th Cir. 1990); *Int'l Ass'n of Machinists & Aerospace Workers, Airline Dist. 146 v. Frontier Airlines, Inc.*, 664 F.2d 538, 541 (5th Cir. 1981) ("*Frontier*"). Namely, where: (1) it is "necessary to preserve the jurisdiction of the grievance procedure"; or (2) "a disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless." *Id.* (quoting *Teamsters,* 875 F.2d at 1136); *Frontier*, 664 F.2d at 541–42.

Second, in a major dispute, a court can issue an injunction: (1) to reinstate the status quo when a party improperly disrupts it; and (2) to enjoin a self-help measure when it is prematurely taken. *Conrail*, 491 U.S. at 302–03; *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO*, 243 F.3d 349, 362 (7th Cir. 2001). And, a court may do so "even without the traditional showing of irreparable injury to the other party." *United Air Lines, Inc.*, 243 F.3d at 362.

Third, Section 152, First's command "to exert every reasonable effort to make and maintain agreements" was "intended to be more than a mere statement of policy or exhortation to the parties." *Chicago & N. W. Ry. Co.*, 402 U.S. at 577. Rather, it is "a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Id.* One of those appropriate means is issuing an injunction requiring a party to bargain in good faith when it fails to do so. *Id.*

### C.  Authority to issue an injunction under the NLGA

Further limiting a court's authority to issue an injunction in a railway labor dispute is the Norris-LaGuardia Act ("NLGA").  29 U.S.C. § 108, *et seq.*  Congress enacted the NLGA in 1932 intending to "tak[e] the federal courts out of the labor injunction business." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982) (quoting *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369 (1960)) (emphasis omitted).  By narrowing the courts' jurisdiction to enjoin labor disputes, Congress hoped to stop courts from indiscriminately awarding injunctions against striking employees—a practice that had become commonplace across federal courts.  *See Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 620 (1967) (stating that "[f]ederal court injunctions freely issued against all manner of strikes and boycotts under rulings that condemned virtually every collective activity of labor as an unlawful restraint of trade").  For example, Section 8 of the NLGA precludes injunctions except where the plaintiff has "ma[d]e every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."  § 108.

If the NLGA totally divested the courts of power to issue an injunction, however, the RLA's mandates would ring hollow.  "To accommodate the competing demands of the RLA and the Norris-LaGuardia Act, our cases establish that the Norris-LaGuardia Act does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act."  *Burlington N. R.R. Co.*, 481 U.S. at 445 (citing cases).  But this exception is a limited one.  "[W]hen a violation of a specific mandate of the RLA is shown, courts should hesitate to fix upon the injunctive remedy . . . unless that remedy alone can effectively guard the plaintiff's right."  *Id.* at 446.

### D. The District Court's Injunction

Here, the district court enjoined SMART-TD from (1) refusing and/or failing to bargain in good faith with each of the Railroads over the November 2019 Crew Consist Proposals in the manner required by the RLA; and (2) from refusing and/or failing to bargain in good faith with the multi-carrier group of Railroads with respect to the Railroads' November 2019 Alternative Wage Proposal.  On appeal, SMART-TD challenges only the first part of the injunction, so our review is limited accordingly.

We have already established that there is a major dispute over crew consist and a minor dispute over the interpretation of the moratorium.  We must next determine whether either of these disputes triggered the court's authority to issue an injunction.  Predictably, the parties disagree about what type of injunction the court issued.  SMART-TD contends that the district court erroneously issued a status quo injunction, which is a major dispute remedy, in the moratorium dispute, which is minor.  The Railroads insist that the injunction was issued under the major crew consist dispute and was ordered to enjoin SMART-TD's violation of Section 152, First.

The parties do seem to agree that the injunction was not granted as a minor dispute remedy.  We concur, as the court made no findings that the injunction was either (1) necessary to preserve the jurisdiction of the grievance procedure; or (2) that disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless. *Teamsters*, 875 F.2d at 1136.  Without these necessary findings, we cannot affirm the district court's injunction as a properly issued remedy in a minor dispute.

Nor can we say that the injunction was warranted as a major dispute remedy.  The district court concluded that the injunction "is necessary to preserve the status quo[,]" which, along with enjoining premature strikes, is

No. 20-10162

a proper ground to issue an injunction in a major dispute. *Conrail*, 491 U.S. at 302–03. The problem is that the injunction the court issued does not preserve the status quo. *Compare with Chicago & N. W. Ry. Co. v. United Transp. Union*, 471 F.2d 366, 368 (7th Cir. 1972).[9] During a major dispute, the status quo refers to "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo Shore R.R. Co. v. United Transp. Union*, 396 U.S. 142, 153 (1969). According to the Railroads, here, "the 'status quo' requirement prohibits the carriers from unilaterally changing crew consist rules to eliminate or redeploy conductors—and prohibits SMART-TD from striking in response to the carriers' proposals—until the bargaining process is complete." The district court's injunction does neither of those things. If purported to be a major dispute remedy to preserve the status quo, therefore, it was improper. *Conrail*, 491 U.S. at 302–03.

Section 152, First is the only remaining ground that may validate the district court's order. When the Supreme Court first established that Section 152, First's duty to bargain in good faith was judicially enforceable, it

---

[9]The Seventh Circuit affirmed the district court's injunction after it found that an injunction was necessary to maintain the status quo

> [B]ecause a strike would (1) moot the appeal; (2) irreparably injure CNW and the public, because it would suspend the transportation of freight and passengers resulting in the loss of hundreds of thousands of dollars in revenue each day to CNW; (3) deprive the public of transportation, including 90,000 commuters daily, as well as mail, freight, etc.; (4) seriously impair government services, including both military and civilian personnel, supplies, material, etc.; (5) threaten the health and welfare of a whole section of the country because of a shortage of food, medicines, etc.; and (6) stop essential transportation services to millions of people.

*Chicago & N. W. Ry. Co.*, 471 F.2d at 367 n.2.

observed "that 'whether action taken or omitted is in good faith or reasonable, are everyday subjects of inquiry by courts in framing and enforcing their decrees.'" *Chicago & N. W. Ry. Co.*, 402 U.S. at 579 (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 548 (1937)). It therefore found "no reason to believe that the district courts are less capable of making the inquiry in the one situation than in the other." *Id.* This focus on a court's ability to make a good faith determination in the context of a railway labor dispute signifies that good faith is a threshold inquiry as to whether a party violated Section 152, First. *Cf. Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 544 (9th Cir. 1992) ("*Horizon*") (citing *Chicago & N. W. Ry. Co.*, 402 U.S. at 579) ("Thus the Court clearly held the duty to 'exert every reasonable effort' imposed by the RLA requires *at least* 'the avoidance of bad faith as defined' under the NLRA.'").

The district court stated that it "made findings and conclusions . . . that SMART-TD has refused to engage in good-faith bargaining as required by the RLA," but identified no factual determinations in the opinion to support such a conclusion. It is true that many of the conventional factors bearing on good faith bargaining, such as "obstinate and unyielding" or "extremely harsh" demands, "movement toward the position of the other side," or engaging in "take-it-or-leave-it" bargaining, are inapplicable, here, where there was no bargaining at all. *Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters*, 650 F.2d 949, 958 (9th Cir. 1980); *Indep. Fed'n of Flight Attendants v. Trans World Airlines, Inc.*, 682 F. Supp. 1003, 1026 (W.D. Mo. 1988), *aff'd*, 878 F.2d 254 (8th Cir. 1989); *Chicago & N. W. Ry. Co. v. United Transp. Union*, 330 F. Supp. 646, 650 (N.D. Ill. 1971). But also relevant to the good faith question is "the proffered reasons for regressive bargaining," *Chicago Local No. 458–3M v. Nat'l Labor Relations Bd.*, 206 F.3d 22, 33 (D.C. Cir. 2000), and whether a "withdrawal of a proposal by an employer *without good cause* is evidence of a lack of good faith bargaining," *Mead Corp. v. N.L.R.B.*, 697 F.2d 1013, 1022 (11th Cir. 1983) (emphasis added). The

district court did not analyze SMART-TD's reasons for its positional bargaining or whether its reliance on the moratorium constituted good cause for refusing to negotiate.[10] Because the requisite good-faith inquiry and accompanying factual findings are omitted, we are unable to affirm the injunction as proper under Section 152, First.

But the Railroads are not entitled to an injunction requiring SMART-TD to bargain crew consist for additional reasons: (1) they cannot prove that an injunction is the only means of enforcing Section 152, First; (2) they cannot prove that there is a threat of an interruption to commerce; and (3) they cannot overcome the NLGA's policy against injunctions.

First, the Supreme Court has admonished that a court should avoid "freewheeling judicial interference in labor relations," and should issue an injunction only where it is "the only practical, effective means of enforcing the command of § 2 First." *Chicago & N. W. Ry. Co.*, 402 U.S. at 582–83. Issuing an injunction is *one* way to force SMART-TD to bargain, but it is not the only way. To wit, the arbitration board may conclude—in a binding decision—that the Railroads' interpretation of the moratorium is correct,

---

[10] Clearly, not all refusals to bargain violate the RLA. For instance, Section 152, First applies only to disputes "concerning rates of pay, rules, and working conditions." If the Railroads had made a proposal outside of these topics, SMART-TD would have grounds—in good faith—to refuse to bargain. Additionally, because the RLA is not intended to allow for "perpetual warfare," parties may "bind themselves against reopening [contract negotiations] for a period reasonable under the particular circumstances at issue." *Seaboard World Airlines v. Transport Workers Union of Am., AFL-CIO,* 443 F.2d 437, 439 (2d Cir. 1971) (citing, *e.g., Flight Eng's' Int'l Ass'n v. Am. Airlines, Inc.*, 303 F.2d 5, 13 (5th Cir. 1962)). Thus, a moratorium would provide another good faith ground for a party to refuse to negotiate. Indeed, that the Railroads did not serve the same Section 6 notices on the seven properties with the moratoriums that explicitly include "crew consist" indicates that the Railroads believe SMART-TD *would* be justified in refusing to bargain on the reduction of crew size for those properties. Thus, the Railroads' assertion that all refusals to bargain violate the RLA and are subject to injunction lacks merit.

that the moratorium does not preclude bargaining over crew consist, and that SMART-TD is therefore required to bargain crew consist. *Conrail*, 491 U.S. at 310 n.8 (finding that arbitrators have broad authority to "fashion an appropriate compensatory remedy which takes account of the delay"). Because this alternative path to enforce Section 152, First still exists, we vacate and remand. Until the Railroads have exhausted the procedures set forth in the RLA, including arbitration, we cannot say that an injunction is "the only practical, effective" means of enforcing the command of Section 152, First. *Chicago & N. W. Ry. Co.*, 402 U.S. at 582–83.

Second, we have found that Section 152, First applies only to actions that cause "interruption to commerce or to the operation of any carrier." *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 286 F.3d 803, 807 (5th Cir. 2002) (quoting 45 U.S.C. § 152, First). For that reason, injunctions granted under Section 152, First have been issued almost exclusively to enjoin a union's strike that would have interrupted the service of transportation to the public. *See, e.g.*, *Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Int'l*, 416 F.2d 633, 637 (4th Cir. 1969).[11]

The Railroads assert that the delay in bargaining is disrupting industrial peace by "threaten[ing] the course of bargaining throughout the rail industry." But they make no allegation that there is a threat of interruption to commerce or to their operations. The RLA encourages negotiations because "we [] assume that negotiation, as required by the decree, will [] result in agreement," and as a result, evade disruptions to the

---

[11] *See also Chicago & N. W. Ry. Co.*, 330 F. Supp. at 648–49; *Aircraft Serv. Int'l Inc. v. Int'l Bhd. of Teamsters AFL CIO Local 117*, 742 F.3d 1110, 1120 (9th Cir. 2014), *on reh'g en banc* 779 F.3d 1069 (9th Cir. 2015) (issuing injunction where "Employees are unwilling to even 'go through the motions' under the RLA; rather, they wish not to bargain but to strike."); *but see Horizon*, 976 F.2d 541.

industry. *Virginian Ry. Co.*, 300 U.S. at 552. But this policy does not apply here, where it is not inevitable that disruptive self-help measures will ever become available to the parties. In other words, the district court's order requires the parties to start down the major dispute bargaining process, where self-help measures could become available before the arbitration board determines such a process is necessary. In this rare circumstance, requiring the parties to bargain nudges the dispute closer to a strike, undermining the RLA's principal goal of avoiding labor strikes. *Burlington N. & Santa Fe Ry. Co.*, 286 F.3d at 807 (quoting *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930) ("[S]trike prevention, not dispute resolution per se, was 'the major purpose of Congress in passing the Railway Labor Act.'")).

The Supreme Court's guidance in *Conrail* supports our decision. There, the Court rejected the idea that a minor dispute could be transformed into a major dispute if a party implemented the proposed change before arbitration. 491 U.S. at 308 (dismissing "the Union's position [] that, while a dispute over the right to make the change would be a minor dispute, the actual making of the change transforms the controversy into a major dispute."). Because the Court found the dispute "is properly deemed a minor dispute within the exclusive jurisdiction of the Board," it refused to issue an injunction. *Id.* at 312. The Court recognized that "[t]he effect of this ruling . . . will be to delay collective bargaining in some cases until the arbitration process is exhausted." *Id.* at 310. But it found "no inconsistency between that result and the policies of the RLA" because "[d]elaying the onset of that process until the Board determines on the merits that the employer's interpretation of the agreement is incorrect will assure that the risks of self-help are not needlessly undertaken." *Id.* at 309–10.

So too, here. By vacating the injunction, we defer the minor moratorium dispute to the *exclusive* jurisdiction of the board, allow it to first decide whether SMART-TD is required to bargain, and potentially avoid

No. 20-10162

major dispute procedures and the availability of self-help measures all together. [12]

Finally, our conclusion also keeps in mind the policy of the NLGA, which "suggests that the courts should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effectively guard the plaintiff's right." *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 773 (1961). Indeed, Section 8 of the NLGA precludes injunctions except where the plaintiff has "ma[d]e every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. The Railroads maintain that they complied with this provision by sending SMART-TD (1) "a letter offering to bargain over crew consist on a voluntary basis, without prejudice to either side" and (2) "a written claim, in which they offered to conference this matter, *i.e.*, to try to resolve it, and proposed arbitration." And, because SMART-TD failed to respond to these overtures, the Railroads assert they were not required to do anything further to comply with Section 8 of the NLGA.

While the Railroads made valiant efforts to negotiate with SMART-TD, the fact remains that there is an administrative avenue provided by the RLA that has not been deployed: arbitration. *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R. R.*, 321 U.S. 50, 65 (1944) ("Arbitration

---

[12] The Railroads contend that their right to move unilaterally in the minor moratorium dispute "eliminates any excuse for refusing to bargain over the pending crew consist Section 6 notices." But asking the court to allow the Railroads to move unilaterally is a request to enforce Section 153's minor dispute procedures. However, the Railroads failed to argue, and have therefore waived any argument, that such an injunction was (1) necessary to preserve the jurisdiction of the grievance procedure; or (2) that disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless. *Teamsters*, 875 F.2d at 1136; *Gann v. Fruehauf Corp.*, 52 F.3d 1320, 1328 (5th Cir. 1995).

No. 20-10162

under the Railway Labor Act was available, afforded a method for settlement Congress itself has provided, and until respondent accepted this method it had not made 'every reasonable effort to settle' the dispute, as Section 8 requires."). And because this unexhausted remedy remains, an injunction is not the only effective way to guard the Railroads' right to bargain in good faith with SMART-TD.[13]

## IV.

The permanent injunction is **VACATED.** We **VACATE** and **REMAND** for additional proceedings consistent with this opinion. We rule

---

[13] This unexhausted remedy is also what distinguishes this case from both *Virginian Ry. Co.*, 300 U.S. at 552 and *Horizon,* 976 F.2d 541, the only cases the Railroads identity where a court issued an injunction under Section 152, First without an imminent threat of a strike. First, in *Virginian Ry. Co.* the Supreme Court was faced with a carrier's refusing negotiation in violation of Section 152, First *and* of Section 152, Third's "duties not to maintain a company union and not to negotiate with any representative of the employees other than respondent and the affirmative duty to treat with respondent." 300 U.S. at 550. The newly formed union in *Virginian* had already sought and obtained certification by the National Mediation Board; thus, it, unlike the Railroads, had no procedural remedies left in the RLA to enforce its rights under Section 152, First and Third. *Id.* at 539.

Similarly, in *Horizon*, the union endured two years of negotiations, including an intervention by the National Mediation Board, before the union sought an injunction under Section 152, First. 976 F.2d at 543. In contrast, the Railroads served SMART-TD with this lawsuit on October 25, 2019—before the new round for collective bargaining even began. Moreover, the district court in *Horizon* made specific factual findings that the carrier's dilatory tactics were motivated by its bad-faith predisposition against unionization. *Id.* 546–47 (discussing the district court's findings, including preferential treatment to non-unionized pilots and a handbook for supervisory employees that included a section on "union avoidance"); *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, No. 89-465-MA, 1990 WL 300312, at *3 (D. Or. Aug. 13, 1990) (discussing statement by the carrier that "unlike the flight attendants, the pilots were not organized, were not in an adversary relationship, and were Horizon's 'people.'"). The district court here made no similar findings regarding the motivation behind SMART-TD's refusal to bargain. For these reasons, *Horizon* does not compel a conclusion that the district court's order was proper under Section 152, First.

21

only on the instant permanent injunction. We place no limitation on the decisions that the district court may make on remand, and we intimate no view on the ultimate merits of any issue. Finally, we commend the district court for conscientiously addressing the complex issues presented by this case.