# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 28, 2024

Lyle W. Cayce
Clerk

No. 23-11065

───────────────

Southwest Airlines Pilots Association,

*Plaintiff—Appellant*,

*versus*

Southwest Airlines Company,

*Defendant—Appellee*.

───────────────────────────────

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-2608

───────────────────────────────

Before Elrod, *Chief Judge*, Wiener and Wilson, *Circuit Judges*.
Jennifer Walker Elrod, *Chief Judge*:

A union representing the pilots of Southwest Airlines Company sued the airline, alleging that it violated the Railway Labor Act ("RLA") by intimidating and disciplining pilots who affiliated with the union. The district court concluded that the parties' dispute was subject to arbitration under the RLA and that no exception applied that would vest the court with jurisdiction. Accordingly, it dismissed the union's complaint. Because we conclude that the union sufficiently pleaded the anti-union animus exception, we REVERSE and REMAND.

No. 23-11065

I

Southwest Airlines Pilots Association (the "Union") is a union representing the more than 9,000 pilots employed by Southwest Airlines Company.  The Union contends that Southwest has a long history of "thwart[ing]" the Union's ability to represent an elite corps of pilots known as "check pilots" and "standards check pilots."[1]

Check pilots are a special category of pilots who work closely with the management of Southwest and who are responsible for the training and evaluation of other pilots.  Check pilots must have the "appropriate knowledge, training, experience, and demonstrated ability to evaluate and certify the knowledge and skills of other Pilots."  Under the parties' collective bargaining agreement, Southwest selects certain pilots to perform check-pilot duties in addition to their normal duties as pilots.  Because of these additional duties, check pilots are paid more than other pilots.  Out of the more than 9,000 Southwest pilots, only around 300 are selected to become check pilots.  Around 30 check pilots are selected to be "standards check pilots," who are responsible for the training and evaluation of check pilots.  Although check pilots are unique in many respects, the parties' collective bargaining agreement guarantees that check pilots enjoy the full suite of Union protections offered to other Southwest pilots.

The Union's complaint contains many allegations of Southwest's isolation of check pilots.  For example, the Union alleges that "[f]or decades"

---

[1] The Federal Aviation Administration has adopted the term "check pilot" as a gender-neutral term to replace "check airman."  The parties use the terms interchangeably.  We use the term "check pilot" unless citing a document in the record that uses the now-replaced phrase, "check airman."  Further, as in the Union's complaint, any reference to "check pilots" in this opinion includes both check pilots and standards check pilots.

2

Southwest unilaterally established the Check Pilot Guide, which outlines the working conditions, rules, and pay for check pilots, without bargaining with the Union.  Until 2016, Southwest "refused" to provide the Union with a copy of the Check Pilot Guide.  Further, check pilots, "fearful of losing their special qualification or otherwise suffering management retaliation," were "uncomfortable" contacting the Union for representation.  Check pilots, for example, stopped coming to Union "open houses" because Southwest "threatened" to remove their check-pilot qualifications if they chose to affiliate with the Union.

In an effort to bolster its representation of check pilots, the Union formed a Check Pilot Committee in 2018 and issued an open call for check pilots to volunteer.  This decision, according to the Union, was met "with an aggressive attack" by Southwest.

Shortly after the Union announced the Committee, Southwest updated its Flight Operations Training Manual to prohibit check pilots from participating in any Union committees:

> Employees who currently have an FAA Check Airman/Check Pilot authorization letter on file at Southwest Airlines are prohibited from participating in [Union]-controlled committees and from serving as an officer in the [Union].

Although Southwest later retracted the prohibition, the Union claims that the airline continued its anti-unionization actions via "whisper campaigns and private admonishments against pilots from getting involved with [the Union]."

Southwest's campaign against union activity came to a head when it allegedly stripped the check-pilot qualifications from one pilot, Captain Timothy Roebling, for his decision to join the Check Pilot Committee. Captain Roebling was selected to become a check pilot for Southwest in 2013,

and he later received standards-check-pilot qualifications. Because of his qualifications, the Union recruited Captain Roebling to join the nascent Check Pilot Committee. The Union alleges that, while Captain Roebling considered joining the Committee, he experienced Southwest's anti-union "whisper" campaign, with one pilot telling Captain Roebling, "if you take the [Union] position, you will be stripped of all your [check-pilot qualifications]."

Despite this warning, Captain Roebling joined, and became co-chair of, the Committee in June 2019. Southwest then "took action" against Captain Roebling and "shunned him, took him off projects, and stopped engaging with him on new projects." His peers called him "traitor," "turncoat," and "Jon Weaks' Crony," a reference to then-Union president Captain Jon Weaks. Captain Roebling stepped down from the Check Pilot Committee in December 2020.

Several months later, Southwest terminated Captain Roebling from his check-pilot duties and removed his qualifications. According to the Union, Southwest justified its decision because Captain Roebling had sent inappropriate comments in a private text message group for pilots. In that group, one pilot sent a photo, which prompted several pilots to send irreverent text messages to the group. One pilot sent the phrase, "Puerto Rican fence climber." Captain Roebling sent a one-word text message, "vagina."

The Union, however, alleges that this justification is pretext. According to the Union, the text message group also contained messages that disparaged "various protected classes, including women, older persons, and the LGBTQ community." And although Southwest investigated several check pilots who sent offensive messages, only Captain Roebling lost his

qualifications. Further, Southwest punished Captain Roebling despite the investigation's finding that he "lacked malicious intent" in sending the text message.

In October 2021, the Union sued Southwest in the Northern District of Texas, alleging that the airline violated the Railway Labor Act, 45 U.S.C. §§ 152, Third & Fourth, which, broadly speaking, prohibits a "carrier" from interfering with union representation. Two weeks later, the Union filed a first amended complaint. In its amended complaint, the Union sought injunctive relief prohibiting Southwest from taking disciplinary action against Union members and from "unlawfully interfering with" the Union. It also sought to reinstate Captain Roebling as a check pilot and to recover damages arising from his unlawful discipline, as well as punitive damages for Southwest's wrongful conduct. Finally, it sought a declaratory judgment that Southwest violated the RLA, and a court order requiring Southwest to post a copy of the order on Southwest properties for 180 days.

In November 2021, Southwest filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In September 2022, the district court granted Southwest's motion to dismiss. The district court concluded that it lacked jurisdiction over the Union's claims because they were subject to compulsory and binding arbitration under the RLA.[2]

---

[2] Four days before the district court granted Southwest's motion to dismiss the first amended complaint, the Union moved for leave to file a second amended complaint, which added allegations of further anti-union animus. Although it never granted leave, the district court "dismissed" the second amended complaint in its order dismissing the first amended complaint, and set a two-week deadline for the Union to refile yet another complaint. Because the district court did not address the merits of the Union's second amended complaint, and because the Union does not argue that the district court erred in dismissing it, we do not address the contents of the second amended complaint.

The Union then filed a third amended complaint. The third amended complaint largely mirrored the first amended complaint, but it added allegations that a Southwest manager had recently denied Captain Roebling the opportunity to interview for his renewed application to become a check pilot, even though Southwest was experiencing a check-pilot shortage. After submitting his application, Captain Roebling received an e-mail from a Southwest employee stating that the airline "cannot move [Captain Roebling's] application forward" because he had "not demonstrated a willingness to change [his] behavior" and that he had "publicly stated that [he] did nothing to warrant the removal of [his] qualifications."

In November 2022, Southwest filed a motion to dismiss the third amended complaint, which the district court later granted. The court explained that the new allegations did not "reflect such anti-union animus as would alter" the court's conclusion in its previous order dismissing the complaint.

The Union timely appealed. On appeal, it contends that the district court applied the incorrect standard of review and that the RLA does not preclude jurisdiction.

## II

The RLA, enacted in 1926, governs labor relations in the railroad and airline industries. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.-Airline Div. & Teamsters Loc. 19 v. Sw. Airlines Co.* ("*Teamsters*"), 875 F.2d 1129, 1131 (5th Cir. 1989) (en banc); *id.* at 1142 (Goldberg, J., dissenting). The RLA imposes several duties on carriers, two of which are relevant to this dispute.

One duty, governing the designation of union representatives, states in relevant part that "neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives." 45 U.S.C. § 152, Third.

6

Another states that

> No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or . . . to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

*Id.*, Fourth.

The RLA delineates two tracks for resolving alleged violations of its provisions depending on whether the dispute is classified as "major" or "minor." *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, 973 F.3d 326, 334 (5th Cir. 2020) (citing *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n* ("*Conrail*"), 491 U.S. 299, 302–04 (1989)). "'Major' and 'minor' do not necessarily refer to important and unimportant disputes, or significant and insignificant issues; rather, the terms refer to the bargaining context in which a dispute arises." *Teamsters*, 875 F.2d at 1133.

A major dispute relates to the "formation of collective agreements or efforts to secure them." *BNSF Ry.*, 973 F.3d at 334 (citation omitted). A minor dispute, on the other hand, "contemplates the existence of a collective agreement" and "relates either to the meaning or proper application of a particular provision." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945).

Whether a dispute is major or minor bears on the proper procedure for adjudicating the dispute. Under the RLA, parties in major disputes must undergo a "lengthy process of bargaining and mediation," during which the parties are obligated to maintain the status quo, and the "employer may not implement the contested change in rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 302–03. Federal district courts have

subject matter jurisdiction to enforce the status quo pending mediation. *Id.* at 303.

A minor dispute, however, is subject to "compulsory and binding arbitration before the National Railroad Adjustment Board" or before a board established by the parties. *Id.* Boards have "exclusive jurisdiction over minor disputes," *id.* at 304, with two exceptions. Federal courts retain jurisdiction to resolve minor disputes if: (1) the "dispute-resolution framework of the RLA is either ineffective . . . or unavailable" or (2) actions were taken by the carrier with anti-union animus "for the purpose of weakening or destroying a union." *Bhd. of Ry. Carmen (Div. of TCU) v. Atchison, Topeka & Santa Fe Ry. Co.* ("*Atchison*"), 894 F.2d 1463, 1468 n.10 (5th Cir. 1990) (citations omitted).

The Union contends that the second exception, often called the "animus exception," applies here.

### III

Before addressing the merits of the Union's RLA claims, we must determine the proper standard of review. The parties dispute whether the district court was required to review the Union's complaint under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). In either event, our review is *de novo*, meaning that we employ the same standard as the district court. *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 487 (5th Cir. 2014). Accordingly, we must identify the applicable Rule.

The Union contends that, because the jurisdictional issue in this case is "intertwined" with the merits, the district court was required to review its complaint under Rule 12(b)(6). Southwest argues that the Rule 12(b)(1) standard applies because the airline launched a "facial" attack on the Union's complaint.

No. 23-11065

Generally, when a party files a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) in conjunction with a motion to dismiss under Rule 12(b)(6), the jurisdictional challenge is addressed first. *Fort Bend County v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 188 (5th Cir. 2023). When the issue of jurisdiction is intertwined with the merits, however, the court "must assume jurisdiction and proceed to the merits" of the plaintiff's claims under Rule 12(b)(6). *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1030 (5th Cir. 2022) (citation omitted). A three-factor test applies to determine whether the jurisdictional and merits analyses are intertwined.[3]

In this case, the district court concluded that the jurisdictional and merits analyses were intertwined. We agree with the district court's assessment. Jurisdiction under the RLA relies entirely on an analysis of the merits of the Union's claim, namely, whether this dispute is a minor dispute and whether an exception applies. Indeed, the one circuit to have squarely addressed this issue reached the same conclusion. *Robinson v. Union Pac. R.R.*, 245 F.3d 1188, 1191 (10th Cir. 2001) (concluding that jurisdiction and merits of plaintiff's RLA claim were intertwined because both relied on a determination of whether a dispute was "minor" under the RLA).

Southwest makes no developed argument as to why these issues are not intertwined, arguing instead that it launched a "facial" attack on the Union's complaint. But that argument assumes that Rule 12(b)(1) applies, because the distinction between facial and factual attacks applies only under

---

[3] First, does the "statutory source of jurisdiction differ from the source of the federal claim?" *Pickett*, 37 F.4th at 1030 (alteration adopted) (citation omitted). Second, can "the jurisdictional issue . . . be extricated from the merits and tried as a separate issue?" *Id.* (citation omitted). And third, does "judicial economy favor early resolution of the jurisdictional issue?" *Id.* at 1031 (alteration adopted) (citation omitted).

Rule 12(b)(1). *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). In other words, Southwest's argument does not answer the antecedent question of whether the court should have resolved this case under Rule 12(b)(1) or 12(b)(6).

Accordingly, the standards of a Rule 12(b)(6) motion to dismiss apply here. *Pickett*, 37 F.4th at 1019 (proceeding under Rule 12(b)(6) standard after determining that jurisdictional and merits issues were intertwined). Under that standard, we "accept as true all well-pleaded facts and construe the complaint in the light most favorable to the plaintiff." *Norsworthy v. Hous. Indep. Sch. Dist.*, 70 F.4th 332, 336 (5th Cir. 2023) (citation omitted). "However, we do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (citation and quotation marks omitted).

The Union contends that the district court failed to apply this standard and improperly weighed evidence, which it may do under the Rule 12(b)(1) standard. *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012) (explaining that, in a jurisdictional challenge under Rule 12(b)(1), a trial court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case"). Although the district court articulated the standards of both Rule 12(b)(1) and 12(b)(6), its opinion does not specify which Rule it applied and on which basis it dismissed the complaint. The court later clarified in an order denying reconsideration of the opinion, however, that the Union's allegations "did not warrant a finding of jurisdiction in this case." The district court further explained that, even under a "more deferential standard of review," like Rule 12(b)(6), the Union's complaint was properly dismissed. Thus, although the district court correctly concluded that the issues were intertwined, it appears to have analyzed the Union's complaint under Rule 12(b)(1).

"[T]o the extent the district court applied the 12(b)(1) standard, it was in error." *M.D.C.G. v. United States*, 956 F.3d 762, 769 (5th Cir. 2020). However, the Union does not cite any disputed facts that the district court improperly resolved against it. The Union instead lists several alleged facts that, in its view, sufficiently plead the animus exception under the RLA. The Union's argument, though, only concerns the significance that the district court assigned those alleged facts in its analysis of the Union's claim. That argument fails to show how the district court improperly resolved any disputed facts against it.

To be sure, Southwest did submit the declaration of Captain Chris Meehan, Southwest's Senior Director of Training, which contests the reasons for Southwest's decision to strip Captain Roebling of his qualifications. Southwest attached this declaration to its motion to dismiss the first amended complaint. The district court, however, explicitly ignored that declaration and dismissed the case solely on the face of the complaint.[4]

In sum, the jurisdiction and merits analyses are "intertwined" in this case; thus, Rule 12(b)(6)'s standards apply. To the extent that the district court failed to apply this standard, that was error. Nevertheless, we may proceed with a *de novo* review of the Union's complaint under Rule 12(b)(6). *M.D.C.G.*, 956 F.3d at 769 (reviewing complaint *de novo* under Rule 12(b)(6) where district court incorrectly applied Rule 12(b)(1) standard).

---

[4] In its opinion, the district court referenced other items outside of the pleadings, including a grievance that Captain Roebling filed with Southwest. On appeal, neither party alleges that it was improper for the district court to do so. At any rate, it does not appear that the grievance factored into the district court's analysis. Indeed, the district court "conclude[d] that [the Union] has not *pleaded* anti-union animus" to proceed on its claim. Apart from acknowledging this grievance, we do not consider it here.

IV

We now turn to the merits of the Union's claim.  The district court concluded that this was a "minor dispute" subject to mandatory arbitration under the RLA and that the Union failed to plead the animus exception.  We agree with the first conclusion, but not the second.

A

To determine whether a dispute is minor for purposes of the RLA, we look to the "arguable basis" test.  *Atchison*, 894 F.2d at 1467–68 (citing *Conrail*, 491 U.S. at 306–07).  Under that test, a dispute is minor if the carrier has at least an arguable basis for its conduct in the "express and implied" terms of the parties' collective bargaining agreement.  *Id.* at 1468.  The carrier faces a "relatively light burden" to show that a dispute is minor.  *BNSF Ry.*, 973 F.3d at 335 (citation omitted).

For example, when American Airlines prohibited its employees from wearing union pins on their uniforms because they would "promote controversy," we concluded that the dispute was minor because the parties' collective bargaining agreement established rules on the wearing of uniforms. *Ass'n of Pro. Flight Attendants v. Am. Airlines, Inc.*, 843 F.2d 209, 211–12 (5th Cir. 1988).

In this case, § 18(A) of the parties' collective bargaining agreement explains that "pilots are selected as Check Airmen by [Southwest] . . . ."  As the district court reasoned, this provision vests Southwest with the discretion to select check pilots, so whether Southwest retains the ability to unilaterally deselect check pilots hinges on an interpretation of § 18(A).  Further, § 15(A) describes procedures for pilot discipline, specifically requiring Southwest to employ "progressive discipline" for "just cause" against non-probationary pilots.  The collective bargaining agreement, however, does not explicitly list the removal of check-pilot qualifications as a disciplinary measure, and it is

unclear whether Captain Roebling's actions constituted "just cause." Thus, whether removal of these qualifications constitutes a form of permissible "progressive discipline" also involves an interpretation of the collective bargaining agreement. Finally, although not addressed by the district court, § 2.O.1 of the collective bargaining agreement prohibits any pilot from being "interfered with, restrained, coerced or discriminated against by the Company" due to Union membership.

Under these provisions, Southwest had "at least an arguable basis" to discipline Captain Roebling and remove his check-pilot qualifications for his improper text message. *See Atchison*, 894 F.2d at 1468. Indeed, the Seventh Circuit has described a disciplinary dispute arising out of the parties' collective bargaining agreement as a "quintessential minor dispute." *Bhd. of Maint. of Way Emps. Div./IBT v. Norfolk S. Ry. Co.*, 745 F.3d 808, 815 (7th Cir. 2014) (internal quotation marks omitted).

The Union argues that this is not a minor dispute because its claim arises directly out of an RLA violation, not a dispute over the terms of the collective bargaining agreement. It cites *Carmona v. Southwest Airlines Co.*, 536 F.3d 344 (5th Cir. 2008), for the proposition that an RLA dispute may arise outside of the minor-major framework—and thus courts retain jurisdiction to hear them—even though the parties' collective bargaining agreement may be relevant to a dispute.

Although the Union, like the plaintiff in *Carmona*, alleges that the carrier's discriminatory motive spurred retaliatory action, *Carmona* dealt with claims arising under Title VII and the Americans with Disabilities Act. And *Carmona* drew support, in part, from First and Eighth Circuit caselaw holding that ADA claims are "independent of the RLA and are therefore outside the ambit of disputes classified as minor." *Id.* at 350 (citations omitted). RLA claims of retaliatory firing based on union affiliation, on the

other hand, are routinely treated as minor disputes, in which judicial intervention is appropriate only if an exception applies. *See Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) (concluding that a dispute was minor where plaintiff argued that her claim for retaliatory firing was "independent of the governing-collective bargaining agreement" and instead a violation of 45 U.S.C. § 152, Third & Fourth); *Atchison*, 894 F.2d at 1467–69 (rejecting a plaintiff's argument that the dispute was "neither a major nor a minor dispute but, rather, a direct statutory violation of the RLA's" text).[5]

Because Southwest had "at least an arguable basis" to discipline Captain Roebling under the terms of the collective bargaining agreement, this litigation presents a minor dispute under the RLA. Accordingly, this dispute is subject to arbitration between the parties unless an exception applies.

---

[5] *See also Stewart v. Spirit Airlines, Inc.*, 503 F. App'x 814, 820 (11th Cir. 2013) (concluding that litigation involved a minor dispute where plaintiff alleged retaliatory termination based on union involvement); *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 142 (2d Cir. 1986) (same); *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 703 (3d Cir. 1982) (concluding that disciplinary proceedings, which the plaintiff alleged were "sham" charges intended to cover anti-union animus, were a minor dispute).

The Union cites *Fennessy v. Southwest Airlines*, 91 F.3d 1359 (9th Cir. 1996), as an example of an RLA-based claim found not to be a minor dispute. But *Fennessy*, as recognized in other Ninth Circuit cases, involved a precertification dispute, meaning that the dispute arose before the parties established a collective bargaining agreement. *See Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 280 F.3d 901, 906 (9th Cir. 2002). In precertification cases, the RLA's protections are far more robust. *See Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 31 F.4th 337, 343 (5th Cir. 2022) (explaining that the Supreme Court has clarified "that [§ 152] of the RLA addresses 'primarily the precertification rights and freedoms of unorganized employees' and is not usually grounds for judicial intervention once the union has been certified" (citation omitted)). Accordingly, *Fennessy* is inapplicable here.

B

The district court concluded that Southwest's first amended complaint failed to sufficiently plead the animus exception. After the Union filed its third amended complaint, the district court again dismissed, concluding that the additional allegations surrounding Captain Roebling's attempt to reapply for a check-pilot position did not alter the district court's original conclusion.

If litigation presents a minor dispute, courts may "address claims that carrier actions reflect antiunion animus or undermine the effective functioning of the union . . . ." *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.* ("*BLET*"), 31 F.4th 337, 342 (5th Cir. 2022) (quoting Douglas Hall et al., The Railway Labor Act § 5.III.A (4th ed. 2016)), *cert. denied*, 143 S. Ct. 564 (2023). In other words, the exception encompasses carrier actions taken "for the purpose of weakening or destroying a union." *Atchison*, 894 F.2d at 1468 n.10.

"The animus exception encompasses direct attacks on the union, as well as more clandestine attempts to punish employees for their union associations." *BLET*, 31 F.4th at 342 (citations omitted). The exception "is rooted in Section 2 of the RLA, which provides that no carrier 'shall in any way interfere with, influence, or coerce' the employees in their 'choice of representatives.'" *Id.* at 343 (quoting 45 U.S.C. § 152, Third).

The Fifth Circuit first addressed this exception in *Brotherhood of Railroad Trainmen v. Central of Georgia Railway Co.*, 305 F.2d 605 (5th Cir. 1962). In that case, a railroad initiated disciplinary proceedings against a union representative employee because his efforts to encourage other employees to pursue workers' compensation claims constituted "gross disloyalty." *Id.* at 606. The union sued, alleging that the disciplinary proceedings were an attempt to "hamper, impede and hinder the" union and

"influenc[e] and coerc[e]" the union employees in their choice of representation. *Id.* at 607. We explained that the alleged facts evinced an attempt to "destroy the process of collective bargaining . . . by wrongfully destroying the effectiveness of the chosen representative." *Id.* at 608–09. Thus, the exception applied. *Id.* at 606–07.

We recently applied the animus exception in *BLET*, 31 F.4th at 345. In *BLET*, the carrier suspended only active union participants in connection with an off-duty fight that involved both union and non-union coworkers, despite a policy to discipline all employees who participate in fights. *Id.* at 347. The suspension barred "effectively all" of the union's leadership from the carrier's place of business, violating the RLA's prohibition on carrier interference with union activity. *Id.* at 341.

This case is not unlike *Central of Georgia* or *BLET*. Here, the Union alleges that Southwest's actions "threaten to weaken or destroy the union" by discouraging check pilots from participating in the Union. "Check Pilots who chose to affiliate with the union were threatened with having their special qualifications pulled and sent back to the line, losing their prestigious Check Pilots' responsibilities, titles, and pay." And this anti-Union campaign, according to the Union, was effective. Check pilots grew "fearful of losing their special qualification or otherwise suffering management retaliation" and became "uncomfortable" with contacting the Union for representation. Attendance at Union "open houses" for check pilots plummeted from "30 to 40" attendees to zero after Southwest "coerced and intimidated" them from attending.

In 2018, immediately after the Union announced the formation of the Check Pilot Committee, Southwest issued a blanket ban prohibiting check pilots from participating in any Union committees or serving as officers in the Union. Although this policy was ultimately retracted, its publication bolsters

the Union's allegations that Southwest waged a campaign against Union representation for check pilots.

Further, a superior told Captain Roebling that he would be "stripped of all of [his] qual[ifications]" if he joined the Check Pilot Committee. As soon as he joined the Committee, Captain Roebling was "shunned," taken off projects, and not included on new projects. After he and several of his fellow check pilots sent inappropriate text messages in a text message group, Captain Roebling was "singled out" for discipline "because of his [Union] history" and received the harshest discipline—by far—of any pilot in the group.

These facts sufficiently support the Union's claim that Southwest intended to "weaken[]" or "destroy[]" the operational capacity of the Union. *BLET*, 31 F.4th at 344 (quoting *Atchison*, 894 F.2d at 1468 n.10). Southwest's alleged anti-Union coercion and threats led to decreased attendance at Union events and reduced contact between check pilots and the Union, interfering with the representation of check pilots. *See id.* at 347. Southwest's disciplining of Captain Roebling and removal of him from projects "because of his [Union] activity" further support the Union's allegation that Southwest intended to "hamper, impede and hinder" check-pilot representation and isolate check pilots from Union activity. *See Central of Ga*, 305 F.2d at 605. Accordingly, the Union has sufficiently pleaded the animus exception.[6]

---

[6] In its review of the first amended complaint, the district court concluded that the Union failed to sufficiently plead animus because Captain Roebling was not an active member of the Check Pilot Committee when Southwest removed his check-pilot qualifications. It also reasoned that Southwest's disciplining of Captain Roebling did not "impact[] the union's operational capacity" as did the carrier's suspension of the union officers in *BLET*. Southwest reiterates many of these arguments in its brief. This analysis, however, takes an overly narrow view of the complaint and ignores the allegations of

No. 23-11065

\*    \*    \*

In conclusion, the standards of Rule 12(b)(6) apply to this dispute because the merits and jurisdictional issues are intertwined. Nevertheless, the district court did not misapply this standard or otherwise resolve any disputed facts against the Union.

Further, the Union's complaint presents a "minor" dispute over which arbitration boards have exclusive jurisdiction unless an RLA exception applies. Because the Union's complaint sufficient alleges the animus exception, we REVERSE and REMAND to the district court for further proceedings consistent with this opinion.

---

Southwest's multi-year, anti-Union campaign, in which Southwest "coerced" and "threatened" check pilots from affiliating with the Union.