# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 21, 2026

Lyle W. Cayce
Clerk

No. 24-20460

———————————

Trinseo Europe GmbH,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

Kellogg Brown & Root, L.L.C.; Stephen Harper, *also known as* Steve Harper; Steve Harper Consulting, Incorporated; Polycarbonate Consulting Services, Incorporated,

*Defendants—Appellees/Cross-Appellants*.

———————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-478

———————————

Before Smith, Stewart, and Ramirez, *Circuit Judges*.

Irma Carrillo Ramirez, *Circuit Judge*:

After a jury found that the defendants misappropriated Trinseo Europe GmbH's (Trinseo) trade secrets and awarded it more than $75 million in damages, the district court granted the defendants' motions for judgment as a matter of law and vacated the damages award. It also granted summary judgment on Trinseo's alternative misappropriation of confidential information claims, denied Trinseo's motion for a new trial, and entered a permanent injunction. We AFFIRM.

No. 24-20460

I

A

In the 1960s, The Dow Chemical Company (Dow) started developing a new process for manufacturing polycarbonate (PC). PC is a material known for its high heat tolerance, optical clarity, and high-impact strength. It is used to produce items such as eyeglass lenses, lighting fixtures, medical devices, and bulletproof glass. Dow's PC manufacturing process was based on an "interfacial" process, as distinct from a "melt" process. Its PC plants encompassed a chemical processing side called the "wet" side, and a compounding side called the "dry" side. The wet side is the part of the plant that makes the physical PC in a "flake" form. On the dry side, those flakes are combined and melded with necessary additives to create the actual product—a "pellet"—which is sold to manufacturers that then incorporate the PC into their products.

The wet side (or chemical processing side) includes five sequential stages. The first stage combines carbon monoxide and chlorine gas in the "Phosgene Reactor" to make phosgene gas. The phosgene gas is combined with other chemicals in the "Oligomerization Reactor," and the resulting solution goes through another reactor and a series of centrifuges to yield PC molecules dissolved in methylene chloride. The solution then moves into the "Steam Devolatilization Process," where the PC molecules are first combined with a thermal stabilizer. Then, the PC molecules are agglomerated together while being separated from the methylene chloride solvent solution using a specially designed nozzle, a "snake" apparatus, and other equipment. At this point in the process, a wet flake is formed. The flake is then sent through a series of dryers and transported to the compounding side (i.e., the dry side) for later extrusion into pellet form. The entire process is controlled by the "Process Control Strategy."

Dow first employed its PC manufacturing process in 1985 at its inaugural plant in Freeport, Texas. In 1991, Dow opened another PC

2

manufacturing plant in Germany. Dow then licensed its technology to produce PC through two joint ventures: one with Sumitomo in Japan and one with LG in South Korea. In 2010, Dow sold its entire PC business and technology under the name "Styron" to a private equity company. In 2014, the private equity company changed the name of the business from Styron to Trinseo.

1

Stephen Harper (Harper) worked as a chemical engineer for Dow for 23 years, until his retirement in 1999. He worked on Dow's PC technology during the 1980s and helped develop the Freeport plant. Harper started consulting in the PC industry, and in 2007, he presented information about Dow-type PC technology to, and ultimately created a PC plant design package for, a Chinese company. In 2009, an American engineering firm hired Harper as a consultant. To help with the project, Harper formed Stephen Harper Consulting, Inc. (SHC) and hired a team of former Dow employees known as the "Tech Team."[1] Harper and the Tech Team created a process design package (PDP) that the American engineering firm could use to develop an engineering design package for a Chinese client.[2]

In August 2011, the Stratford Research Institute (SRI) published a report titled "Polycarbonate via Dow Phosgenation Process." This report was based in part on information gleaned from Harper and the Tech Team

---

[1] The core Tech Team group comprised Harper, William Davis, Bryce Koslan, Richard Kirk, and Chip Melton, but other former Dow employees would also play minor roles.

[2] A PDP is a "first level" document that describes the PC plant, its processes, and its equipment. In other words, a PDP is a "controlling document that embodies or describes the [PC] technology." A PDP is a "lead-in" to a basic engineering design plan (BEDP), which "contains all of the information that's required to do [a] detail[ed] design" of the plant and explains "exactly where in the process instrumentation needs to be . . . ." In essence, the BEDP creates "what the plant looks like physically." It is also the package that is given to the "final engineering company."

while they were working on SHC's 2009 project. Trinseo asked SRI to withdraw the report because it "contain[ed] highly confidential, proprietary, and non-public, trade secret information." SRI promptly pulled the report from its website. Trinseo also inquired with SRI about the sources for the report, and SRI responded that the information came from "patents, public documents[,] and various consultants." Trinseo collaborated with SRI on a revised report that was published in November 2011.

In 2012, SHC agreed to provide an American engineering services broker, Prime 3 Group (Prime 3), PC technology and technical support in licensing the technology to other clients. In March 2013, SHC entered into another agreement with Prime 3 to provide a basic engineering design plan for a PC plant for Luxi Chemical Group (Luxi) in China. In April 2013, Enex International (Enex)—a Texas-based technology firm—became the provider of engineering services and detailed designs for the Luxi project. SHC continued to act as the technology provider.

Luxi told Harper it wanted a copy of Dow's LG plant design to help create a similar plant. Harper obtained a copy of Dow's LG plant drawings—which were marked "confidential"—from Tech Team member Chip Melton (Melton), who had retained the drawings after his employment with Dow ended. Harper used the drawings for the Luxi plant, which became operational in 2016. In 2017, Harper dissolved SHC and changed the company's name to PCS.

2

Kellogg Brown & Root, LLC (KBR) approached Trinseo in September 2013 in hopes of licensing its Dow-developed PC technology. Those discussions continued into May 2014, when KBR and Trinseo executed a nondisclosure agreement. During their negotiations, Trinseo learned about "ex-Dow employees rumored to be practicing outside confidentiality boundar[ies]." Certain Trinseo employees, including longtime employee Jerry Duane (Duane), were assigned to "work together"

with KBR to investigate the issue. But there was never a substantive investigation. Instead, Trinseo relied on "a standing instruction" with its employees in China "to report back anything . . . that might be relevant to the company." Employees never "reported anything back about [the] potential of ex-Dow employees consulting."

In September 2014, Trinseo hosted several former Dow employees, including Harper, for the official closure of the Freeport plant. As Harper recalls, during that event he told Duane that "he was doing some consulting with a bunch of old polycarbonate guys from the [1980s]." As Duane recalls, Harper did not "link his consulting activities to consulting in polycarbonate." Duane also did not "make the connection" that Harper might be part of the rumored ex-Dow employees Trinseo assigned him to investigate with KBR.

Ultimately, KBR and Trinseo did not execute a licensing deal— Trinseo decided to stop licensing its PC technology to avoid "get[ting] additional interfacial [PC] into the market."[3] But KBR continued to look for a licensing partner. In 2015, KBR identified Enex—which had worked on the Luxi project—as a potential partner. In 2016, Enex granted KBR a license to use its PC technology. KBR then began marketing its "PCMax" package, advertising it as "Dow-type" PC technology.

Enex later connected KBR to Harper and the Tech Team. After meeting with them in May 2017, KBR was "convinced" that the Tech Team was "well qualified to fill in the gaps" KBR had "regarding the PC technology[,] . . . including final product formulations." In June 2017, PCS

---

[3] In 2014, Trinseo started dwindling down what remained of its PC business. Dow had already sold its interest in the LG joint venture in 2010. Trinseo then closed the Freeport plant and exited the joint venture with Sumitomo. By 2017, the only remaining Trinseo PC production facility was the plant in Germany. Trinseo has not since substantively engaged in the PC industry, except that in November 2024, it executed a PC licensing deal with a company in India.

agreed to provide KBR "technical assistance in support of a two-day sales workshop that KBR had scheduled with LG Chemical." Ultimately, LG never entered into a license agreement with KBR.

In September 2017, PCS and KBR began negotiating an amendment to their agreement. Harper told KBR he intended to develop a PDP based on the LG plant design. In October 2017, KBR secured its first PCMax licensing agreement with a Chinese company, Cangzhou. In November 2017, PCS entered an amended agreement with KBR to provide consulting services. KBR continued to market its PCMax technology as "related to Dow/Trinseo PC technology."

In May 2018, a member of the Tech Team emailed Duane, who was planning to retire soon, and stated that if Duane was "interested in doing some [PC] consulting work, [he] should contact Steve Harper." The email further stated that Harper and others had worked on a PC project in China several years prior, and that Harper had been "having discussions with KBR" regarding a "PC project for another Chinese client." In June 2018, KBR signed a license agreement to develop a PC plant in China for a new client, Pingmei.

B

On February 12, 2020, Trinseo filed its original complaint against Harper, SHC, and PCS (collectively, the "Harper Defendants"). It filed a second amended complaint adding several claims and defendants, including KBR, on January 11, 2022. Relevant to this appeal, Trinseo alleged that the Harper Defendants and KBR misappropriated ten of Trinseo's trade secrets in violation of the Defend Trade Secrets Act (DTSA): (1) the Process Control Strategy and Concept and Control Algorithms (Process Control Strategy), (2) Raw Materials Specifications/Composition, (3) the Phosgene Reactor Design and Associated Pressure Vessel Containment (Phosgene Reactor), (4) the Continuous Plug Flow Oligomerization Reactor Inside Pressure Vessel Containment (Oligomerization Reactor), (5) the Thermal

Stabilizer Addition System, (6) the Steam Devolatilization Process, (7) the Polymer Solution Atomizer Nozzle, (8) the Snake Design, (9) Polycarbonate Product Composition, Formulations, or Recipes, and (10) Negative and Positive Knowledge. Trinseo also alleged, in the alternative, misappropriation of confidential information under Texas law, but the district court found the claims were preempted by the Texas Uniform Trade Secrets Act (TUTSA) and granted summary judgment.

Approximately a year before trial, KBR moved to exclude the opinions of Trinseo's damages expert, Thomas Pastore (Pastore). KBR specifically argued that Pastore was required to apportion damages between the misappropriated features and non-misappropriated features of Trinseo's PC technology. On November 30, 2023, the district court granted KBR's motion in part. As to KBR's apportionment argument, the district court noted that, in the Fifth Circuit, "the proper measure of damages in cases of trade secret appropriation is determined by reference to the analogous line of cases from patent law," which require apportionment "when the accused technology does not make up the entirety of the accused product." The district court stated that "Trinseo appear[ed] willing to gamble that it [could] convince the jury that the allegedly misappropriated trade secrets provided all of the value of KBR's end usage/product," but if Trinseo did not, "Pastore's testimony [would] be totally undermined." It concluded that although Trinseo's "all-or-nothing approach" could fail, the approach did not "render Pastore's opinions inadmissible."

Trinseo presented Pastore's testimony to support its damages model at trial. Pastore's estimation of damages was premised on the purported misappropriation of all ten alleged trade secrets. Pastore did not individually valuate each of the alleged trade secrets or any specific combination of trade secrets, nor did he provide a method for the jury to do so.

Out of the ten trade secrets alleged, the jury found only four—the Process Control Strategy, Phosgene Reactor, Oligomerization Reactor, and Steam Devolatilization Process—actually qualified as trade secrets. The jury

further found that the defendants misappropriated all four of these secrets. The jury awarded Trinseo $50 million in reasonable royalty damages and $21,206,132 in unjust enrichment damages against KBR; $0.00 in unjust enrichment damages against Harper; $2,930,817 in unjust enrichment damages against SHC; and $2,549,706 in unjust enrichment damages against PCS. The jury also found by a preponderance of the evidence that Harper is responsible for the conduct of SHC and PCS. Finally, the jury rejected the Harper Defendants' and KBR's limitations defenses.[4]

After trial, all defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). The district court found that the jury's liability and affirmative defense findings were supported by the evidence. As to damages, it found that—as in patent law—"apportionment is generally required in trade secrets cases involving multiple alleged trade secrets." According to the district court, "to protect itself in the event that the jury finds liability on some, but not all, alleged trade secrets, a plaintiff must provide either (1) evidence that apportions value per trade secret, or (2) evidence that provides some methodology or guidance for how the jury may do so itself." It determined that "Trinseo's failure to apportion [its trade secret damages], combined with the jury's failure to find liability on all ten alleged trade secrets [was] fatal." As a result, the district court granted judgment as a matter of law and vacated the reasonable royalty and unjust enrichment damages against KBR and the Harper Defendants.[5]

---

[4] Specifically, the jury found by a preponderance of the evidence that Trinseo had not discovered, nor should have discovered through the exercise of reasonable diligence, (1) Harper's first alleged misappropriation before February 12, 2017, or (2) KBR's first alleged misappropriation before November 27, 2017.

[5] As to the unjust enrichment award against KBR, the district court made a "contingent alternative finding" that, in the event this court found apportionment was not required, the jury's award was otherwise unsupported by the evidence. On this basis, the district court granted KBR's request for remittitur and reduced the award to $10.5 million.

No. 24-20460

In the same order resolving the Rule 50(b) motions, the district court granted Trinseo's motion for a permanent injunction. It subsequently entered an order enjoining KBR and the Harper Defendants from using Trinseo's trade secrets. The district court then entered a final, take-nothing judgment against Trinseo. Trinseo moved for a new trial on damages, which the district court summarily denied.

Trinseo, KBR, and the Harper Defendants filed timely appeals. The parties first challenge different aspects of the district court's resolution of the motions for judgment as a matter of law. Trinseo also appeals the district court's denial of a new trial on damages, and argues the district court erroneously determined that Trinseo's misappropriation of confidential information claims were preempted by TUTSA.[6] Finally, KBR asserts the district court abused its discretion in granting a permanent injunction.

II

Trinseo argues the district court erred in granting judgment as a matter of law and vacating the damages awarded by the jury. KBR and the Harper Defendants challenge the district court's decision to sustain the jury's liability and affirmative defense findings.

We review decisions on Rule 50(b) motions for judgment as a matter of law de novo, "apply[ing] the same legal standard as the district court." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012). "A party is only entitled to judgment as a matter of law on an issue where no reasonable jury would have had a legally sufficient evidentiary basis to find otherwise."

---

We need not address the district court's alternative finding because, as discussed below, the district court properly vacated the damages based on Trinseo's failure to apportion.

[6] Trinseo presents a myriad of other issues on appeal. It asks the court to resolve the "open question" of whether the jury's response to the unjust enrichment question is "merely advisory" and challenges the district court's contingent grant of a remittitur. If a new trial is granted, Trinseo also challenges certain evidentiary rulings by the district court. Given our decision below, we need not address any of these issues.

*Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, 930 F.3d 647, 653 (5th Cir. 2019) (citing FED. R. CIV. P. 50(a)(1)). "[B]ut our standard of review with respect to a jury verdict is especially deferential." *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (citation modified). We draw all reasonable inferences in the light most favorable to the verdict. *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 239 (5th Cir. 2012).

### A

Trinseo argues the district court erred in relying on patent law apportionment principles to nullify the jury's reasonable royalty and unjust enrichment awards against KBR and the Harper Defendants. Alternatively, it asserts there is sufficient evidence to support the jury's award even under patent law apportionment rules. We disagree on both points.

### 1

The DTSA sets forth available damages with respect to trade secret misappropriation. 18 U.S.C. § 1836(b)(3)(B). First, courts may award "damages for actual loss caused by the misappropriation of the trade secret" and "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss." *Id.* § 1836(b)(3)(B)(i). Alternatively, courts may award "the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." *Id.* § 1836(b)(3)(B)(ii).

As this court has long held, "[i]t seems generally accepted that 'the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement . . . .'" *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535–38 (5th Cir. 1974) (quoting *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957)) (reviewing numerous patent cases to determine how damages should be assessed in the trade secret context). Looking to patent law cases, it is well-established that "[w]hen the

accused technology does not make up the whole of the accused product, apportionment is required." *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). In other words, a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . ." *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (citation modified).

Although we have never explicitly adopted patent law's apportionment principles in the trade secret context, we outlined the same general principles in *University Computing*. *See* 504 F.2d at 537–539. Specifically, we observed that reasonable royalty damages in trade secret cases should yield "an *apportionment* of profits based on an approximation of the *actual value of the infringed device* to the defendant." *Id.* at 537 (emphasis added). A plaintiff may also recover "the full total of [a] defendant's profits or some *apportioned* amount designed to *correspond to the actual contribution the plaintiff's trade secret made* to the defendant's commercial success." *Id.* at 539 (emphasis added). In short, trade secret damages—whether measured by a reasonable royalty or lost profits—must, like patent damages, "reflect the value attributable to the infringing features of the product, and no more."[7] *See Finjan*, 879 F.3d at 1309 (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)) (applying apportionment principles in a patent law case).

Applying apportionment rules similar to those outlined in *University Computing*, courts have vacated damages awarded by juries due to failure to apportion in trade secret cases. *See, e.g.*, *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) [hereinafter *TAOS*]; *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d

---

[7] Recognizing the emphasis *University Computing* places on apportionment, Trinseo concedes that the "patent-law concept [of apportionment] is not necessarily inconsistent with how this Court conceived of damages in trade secret misappropriation cases."

1064 (N.D. Cal. 2005), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007). In *TAOS*, for example, the jury found the defendant misappropriated three trade secrets and awarded disgorgement damages. 895 F.3d at 1310. On appeal, the Federal Circuit affirmed the jury's liability finding as to only one of the trade secrets. *Id.* at 1312–15. Because the plaintiff "did not explain which of the trade secrets contributed to what amount of profit to be disgorged" and instead "assigned all profits to the misappropriation of all trade secrets," however, the Federal Circuit found "no basis to conclude that the [one] remaining" trade secret "support[ed] the entire award." *Id.* at 1317. As a result, it held that the "monetary award for trade secret misappropriation must be vacated because [the court had] determined that misappropriation liability here can properly rest on only one of the three grounds that [the plaintiff] presented to the jury. [The plaintiff's] calculation of monetary relief did not distinguish among those grounds." *Id.*

Likewise, in *O2 Micro*, the jury determined that the plaintiff had established eleven trade secrets, but only five were misappropriated by the defendant and only one unjustly enriched the defendant. 399 F. Supp. 2d at 1069. Prior to trial, the district court had warned the plaintiff "of the dangers of bundling all of its alleged trade secrets damages together." *Id.* at 1076. Regardless, the plaintiff's expert only "provided the jury with a damages calculation based on an assumption that all of the trade secrets were misappropriated." *Id.* Because the expert did "not provide a reasonable basis for the jury to apportion damages," the court concluded there was no "reasonable basis for the jury to determine the amount that [the defendant] was unjustly enriched based upon its misappropriation of [one trade secret]." *Id.* at 1077. "After the jury concluded that [the defendant] did not misappropriate all of [the plaintiff's] trade secrets," the court reasoned that the "expert testimony regarding damages for misappropriation of all trade secret[s] was useless to the jury." *Id.* The district court then granted the defendant's motion for judgment as a matter of law as to the jury's unjust enrichment award. *Id.*

No. 24-20460

The reasoning in *TAOS* and *O2 Micro* is consistent with the apportionment principles outlined by this court in *University Computing*, and we find it persuasive.[8] They also reflect the commonsense notion that trade secret damages must be tied to the defendant's wrongful conduct—i.e., the misappropriation. Here, Trinseo presented damage estimations that assumed misappropriation of all ten alleged trade secrets. But the jury found only four trade secrets were misappropriated by KBR and the Harper Defendants. Because Trinseo had "bundl[ed] all of its alleged trade secrets damages together," the jury did not have a reasonable basis to award damages

---

[8] Although *TAOS* and *O2 Micro* were in the same procedural posture as this case, we note that several district courts have applied the same apportionment principles when resolving motions for summary judgment and to exclude expert testimony. *See, e.g.*, *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 671 (E.D. Tex. 2002) (granting summary judgment on the plaintiff's state law trade secret claims because the plaintiff "fail[ed] to apportion the value of its alleged trade secrets" and instead "attempt[ed] to attribute every penny of . . . [its] technology to the value of its alleged trade secrets"); *LivePerson, Inc. v. [24]7.AI, Inc.*, No. 17-CV-01268-JST, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) ("[The expert's] opinion must be excluded because he does not apportion trade secret misappropriation damages among particular alleged trade secrets, and offers no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case."); *Int'l Med. Devices, Inc. v. Cornell*, No. 20CV3503CBMRAOX, 2023 WL 4295157, at *5 (C.D. Cal. Feb. 13, 2023) (precluding an expert from "testifying that the jury should award the entire $15.4 million lump-sum royalty if the jury found that only one [out of four] of Plaintiffs' alleged trade secrets has been misappropriated"); *Ford Motor Co. v. Versata Software, Inc.*, No. 15-11624, 2018 WL 10733561, at *11 (E.D. Mich. July 9, 2018) (excluding an expert's testimony regarding trade secret damages because he "failed to apportion [the plaintiff's] alleged damages on a trade-secret-by-trade-secret basis" and so, "if the jury were to conclude that [the defendant] misappropriated less than all of [the plaintiff's] trade secrets . . . , then [the expert's] damages calculation would not assist the jury in calculating damages and could only serve to confuse them"). This was the context in which the district court in this case first faced the apportionment issue, as KBR moved to exclude Pastore's opinions based on failure to apportion. Although the district court denied the motion to exclude on this basis, it warned Trinseo that it's its "all-or-nothing approach" to damages was a "gamble." It further put Trinseo on notice that Pastore's testimony would be "totally undermined" if Trinseo failed to obtain a verdict on all ten alleged trade secrets.

based on the misappropriation of only four trade secrets.[9] *See O2 Micro*, 399 F. Supp. 2d at 1076; *TAOS*, 895 F.3d at 1317.

Trinseo urges us to look instead to the Sixth Circuit's decision in *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022), which Trinseo asserts rejected *O2 Micro* and *TAOS*. But *Caudill distinguished O2 Micro* and *TAOS*, emphasizing that the expert did not take an "all-or-nothing approach" and "gave the jury options" that "allowed the jury to calculate the value" of one trade secret "even while finding no misappropriation of" other trade secrets. 53 F.4th at 389. Trinseo's expert did not give the jury similar options.

Trinseo also relies on *Bishop v. Miller*, 412 S.W.3d 758 (Tex. App.—Houston [14th Dist.] 2013, no pet.), arguing it represents a "flexible, non-categorical" approach to trade secret damages. In *Bishop*, the defendant argued the plaintiff's expert's "damages calculations were unreliable because he failed to provide separate values for each of the items the jury found to be [the plaintiff's] trade secrets and instead provided only one value for misappropriation." 412 S.W.3d at 777–78. The court rejected that argument, however, because the jury found that the plaintiff "owned a *compilation trade secret* comprised of some or all of the thirteen items listed in the jury charge." *Id.* at 778 (emphasis added). The jury in this case was not presented with a question regarding compilation trade secrets.

Finally, Trinseo argues that the district court's so-called "strict apportionment" requirement—a term that the district court used twice in its

_____

[9] Trinseo argues *O2 Micro* is not instructive because the district court ultimately awarded reasonable royalty damages. But the district court in *O2 Micro* determined that the plaintiff's "reasonable royalty estimate" was not "plagued with the same problem as its unjust enrichment damages award" because there was expert testimony "that the parties in a hypothetical negotiation would agree to a $900,000 paid-up reasonable royalty for any one group of trade secrets." 399 F. Supp. at 1077–78. The expert also testified that the trade secrets found by the jury "would be an example of a group of trade secrets." *Id.* at 1078. Trinseo did not present similar evidence.

48-page order—conflicts with the flexible approach to trade secret damages adopted in *University Computing. See* 504 F.2d at 535. First, although this court has endorsed a flexible approach to trade secret damages, that does not disturb the settled principle that "[e]stimation of damages . . . should not be based on sheer speculation." *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986); *Alcatel*, 239 F. Supp. 2d at 669 ("While the Court recognizes that some degree of speculation is inherent in calculating a suppositious licensing agreement between two parties that has never occurred, this hypothetical construct, however, must contain some degree of certitude."). Allowing damages to be awarded for the misappropriation of *four* trade secrets based on an estimation that presumed misappropriation of *ten* trade secrets lends itself to such speculation. Second, despite its passing use of the term, the district court did not create a novel "strict apportionment" theory. Nor do we.

Rather, we hold that, like in patent law cases, trade secret misappropriation damages must reflect the value attributable to the information or technology that is misappropriated by the defendant. It follows that, where a plaintiff alleges *multiple* trade secrets, the jury must have a reasonable basis to award damages attributable only to the information or technology that actually qualifies as a trade secret.[10] Trinseo failed to present evidence that would allow the jury to do so in this case.

2

Trinseo next argues that, even if apportionment principles apply in this case, the district court should have accepted the jury's reasonable royalty

---

[10] There are many ways a plaintiff could "apportion" damages. Given that "every case requires a flexible and imaginative approach to the problem of damages," we need not give an exhaustive list of ways a plaintiff may do so. *See Univ. Computing*, 504 F.2d at 538. But a few possible methods come to mind. For instance, a plaintiff could individually valuate each alleged trade secret. A plaintiff could also valuate a *group* of trade secrets. Alternatively, a plaintiff could provide a methodology for the jury to calculate the value of a particular trade secret or group of trade secrets.

award under either the "built-in apportionment" theory or "entire market value" exception.[11] Trinseo also argues that the jury's verdict should be sustained because the four trade secrets it found were the "heart, core, and driver of the demand for Trinseo's PC manufacturing technology."

a

KBR argues that Trinseo has forfeited its "built-in apportionment" argument. "A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing to adequately brief the argument on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). We have discretion, however, to consider an issue raised for the first time on appeal where "it is a purely legal matter and failure to consider the issue will result in a miscarriage of justice." *Id.* at 398 (quoting *Essinger v. Liberty Mut. Fire Ins. Co.*, 534 F.3d 450, 453 (5th Cir. 2008)).

Here, Trinseo concedes it failed to raise its "built-in apportionment" argument in the district court. The issue is also not a "purely legal matter," as Trinseo admits that it "has both legal and factual aspects." *See id.* "Nor is there manifest injustice to correct here" given that "nothing prevented" Trinseo from raising its "built-in apportionment" argument in responding to KBR's motion for judgment as a matter of law. *See id.* at 399. There is "no principled basis" to address Trinseo's forfeited "built-in apportionment" argument. *See id.* at 398.

b

KBR also argues Trinseo has waived its arguments regarding the entire market value exception. Where an appellant "fail[s] to challenge the district court's finding of waiver," the appellate court is "precluded from

---

[11] Trinseo does not rely on the "built-in apportionment" rule or entire market value exception in the context of the jury's unjust enrichment awards. Even so, our analysis below would apply to the unjust enrichment awards with equal weight.

reaching the arguments" the district court found waived. *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 152 (5th Cir. 2008).

Although the district court in this case provided an in-depth analysis of the entire market value exception on the merits, it also found Trinseo waived the issue. Specifically, the district court stated:

> It is worthwhile to examine Trinseo's position on the entire market value rule in the broader context of the litigation. Trinseo did not request a jury instruction or question pertaining to any interpretation of the entire market value rule. In fact, it specifically argued *against* including KBR's proposed instruction on the issue. At the January 22nd charge conference, KBR requested an instruction on the entire market value rule[.] . . . Trinseo objected, arguing that patent jury instructions cannot be so easily thrown into a trade secret case[] . . . . Consequently, the Court did not include, and Trinseo did not request, an instruction on the entire market value based on either line of cases. Thus, it waived its application.

Trinseo has challenged the district court's conclusion on the merits, but it makes no mention of the district court's finding of waiver. Trinseo's failure to do so precludes this court from now addressing the entire market value issue. *See id.*

c

Finally, KBR argues Trinseo's "heart, core, and value driver" argument is another "thinly veiled entire-market-value-rule argument," which the district court correctly held was waived and wrong on the merits.

It is unclear how Trinseo's "heart, core, and value driver" argument differs in any meaningful respect from the entire market value rule, which is "a narrow exception" to the apportionment requirement that "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer

demand." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (citation modified). The only case Trinseo cites that applied a version of the "heart, core, and value driver" concept did so under the assumption that apportionment was required. *See EchoSpan, Inc. v. Medallia, Inc.*, No. 24-4751, 2025 WL 3046753, at *1 (9th Cir. Oct. 31, 2025) (unpublished). In *EchoSpan*, the district court vacated the jury's unjust enrichment award because the jury found the defendant misappropriated only one out of nine alleged trade secrets and the plaintiff "did not apportion this relief on a trade-secret-by-trade-secret basis." *Id.* The Ninth Circuit acknowledged that, "[i]n a highly technical context, apportionment testimony may be essential to provide a reasonable basis for a jury to value a defendant's gain." *Id.* at *2 (distinguishing *O2 Micro*). But in *EchoSpan*, the plaintiff's "trade secrets could be explained in lay terms" and the jury heard evidence regarding "the relative importance" of the jury-found trade secret to the "system's commercial value." *Id.* at *2. Indeed, the jury heard that *only* that jury-found secret was the "'core' tool that 'enables everything.'" *Id.* As a result, the jury in *EchoSpan* "could determine from the evidence which alleged trade secrets would drive the most value" in the defendant's product. *Id.*

This case, which presents highly technical trade secrets, is markedly different from *EchoSpan*. Here, the jury found four trade secrets: the Process Control Strategy, Phosgene Reactor, Oligomerization Reactor, and Steam Devolatilization Process. At trial, Trinseo's expert testified that the Oligomerization Reactor and Steam Devolatilization Process were *among* the alleged trade secrets that "form[ed] the heart or the core of the value" of Trinseo's PC technology. That very same expert testified that *other*, *non-trade secret components* were the heart or core of the PC technology, including the "thermal stabilizer," "steam nozzle," and "atomizing nozzle." A different expert opined that "the oligomerization and agglomeration were the core and the key elements, especially the snake, the nozzles, [and] the thermal stabilizer." This testimony contrasts with the testimony in

*EchoSpan*, i.e., that *only* the jury-found secret was the "core" of the system. *See id.* Importantly, Trinseo also presented no evidence or methodology that would have allowed the jury to ascribe any particular value to the jury-found trade secrets. Pastore admitted he offered no opinion that would allow the jury to award a "royalty value for" a particular "share" of a misappropriated trade secret if the jury did not "find that each and every trade secret" identified by Trinseo "was in fact misappropriated by KBR."

\*     \*     \*

In sum, Trinseo was required to present evidence that would have allowed the jury to award a reasonable royalty that reflects "an apportionment of profits based on an approximation of the actual value of the infringed device to the defendant," or an "apportioned amount" of the defendants' profits "designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success." *See Univ. Computing*, 504 F.2d at 537, 539. This rule is consistent with the "analogous line of cases involving patent infringement," *id.* at 535 (quoting *Int'l Indus.*, 248 F.2d at 699), which require apportionment "[w]hen the accused technology does not make up the whole of the accused product." *Finjan*, 879 F.3d at 1309. Because Trinseo only presented damage estimates that assumed misappropriation of ten alleged trade secrets, the jury had no basis for awarding damages based on the misappropriation of only the four trade secrets it found. The district court did not err in vacating the jury's award of damages against KBR and the Harper Defendants.

B

KBR argues the district court erred in denying judgment as a matter of law on the jury's findings of liability for trade secret misappropriation. We disagree.

1

KBR contends there is legally insufficient evidence that Trinseo's information qualified as "trade secrets," as that term is defined by the

No. 24-20460

DTSA.

Under the DTSA, information constitutes a "trade secret" where (1) "the owner thereof has taken reasonable measures to keep such information secret," and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

a

First, KBR asserts Trinseo did not take reasonable measures to keep its information a secret, citing four instances that purportedly put Trinseo on notice that its PC technology was publicly disclosed, and which Trinseo did nothing to address. The first instance cited by KBR occurred in August 2011, when SRI published a report regarding Dow's PC technology. Second, in May 2014, Trinseo heard about rumored ex-Dow employees "practicing outside confidentiality boundar[ies]." Third, in September 2014, during the Freeport plant closure, Harper told Duane that he was doing consulting work with former Dow employees. Finally, in May 2018, a member of the Tech Team told Duane he should contact Harper if he was interested in PC consulting work.

For each event cited by KBR, Trinseo has pointed to competing evidence in the record. As to the SRI report, Trinseo immediately requested a withdrawal, inquired about sources, and worked with SRI to create a revised report that did not contain protected information. In addition, Trinseo assigned employees to work with KBR to investigate the rumored ex-Dow employees. It also had a "a standing instruction" with its employees in China to report back relevant information. Duane and Harper's brief meeting at the Freeport plant shows only that Trinseo was on notice that Harper was doing consulting work; there is no evidence suggesting Trinseo was on notice that Harper was using trade secrets. Indeed, Duane testified that Harper did not

mention anything about "providing technology" and that consulting alone did not have cause for concern. And Trinseo sent a demand letter to Harper to stop misappropriating Trinseo's PC technology a year after Duane received an email stating that Harper's consulting involved PC. Viewing the evidence in the light most favorable to the verdict, the jury had sufficient evidence to conclude that Trinseo took reasonable measures to protect its trade secrets.

b

Second, KBR argues that Trinseo's trade secrets were "generally known" because Harper had circulated them in the PC industry for years before KBR acquired the technology. "Secrecy is a relative term. The information may be known to several persons and yet still be secret if third parties would be willing to pay for a breach of trust in order to ascertain it." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1125 (5th Cir. 1991) (citation modified); *see also Reingold v. Swiftships, Inc.*, 126 F.3d 645, 650 (5th Cir. 1997) (holding that information derived economic value from not being generally known where "it would have been extremely expensive and time consuming for anyone to duplicate the [trade secret information] through independent designing, planning, and construction or by reverse engineering").

It is true that long before KBR used Trinseo's trade secrets, the Harper Defendants had been disclosing that information by using the LG plant drawings. But the jury heard testimony that the ten claimed trade secrets were not "generally known or publicly disclosed." Duane also testified he did not think it would be possible for any engineer to "readily ascertain" Trinseo's trade secrets "without spending much time, effort[,] or expense." Indeed, Trinseo presented evidence suggesting KBR did not believe it could complete its PCMax technology without the trade secret information held by the Harper Defendants. In short, even though the trade secrets may have been "known to several persons" due to the Harper Defendants' disclosures, "third parties" like KBR were still "willing to pay

for a breach of trust in order to ascertain [them]." *See Taco Cabana*, 932 F.2d at 1125 (citation modified). As a result, the jury had sufficient evidence that the Process Control Strategy, Phosgene Reactor, Oligomerization Reactor, and Steam Devolatilization Process were not generally known.[12]

2

KBR also asserts there is legally insufficient evidence that it misappropriated Trinseo's technology, attacking different components of the evidence for each of the four trade secrets the jury found. As to the Process Control Strategy, KBR contends there was no evidence that the Tech Team had access to this information. KBR also asserts there is insufficient evidence of misappropriation of the Phosgene Reactor because the jury heard Duane testify KBR did not *use* this technology in its PCMax design. Finally, KBR argues that the jury heard testimony that it either did not acquire or did not use certain elements of the Oligomerization Reactor and Steam Devolatilization Process.

A defendant can misappropriate a plaintiff's trade secret under the DTSA by:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

---

[12] KBR's other arguments on this issue are also without merit. As to the Process Control Strategy, KBR argues that Trinseo failed to sufficiently define this secret because the jury heard testimony that no particular hardware or software was misappropriated. But the jury heard ample evidence describing the Process Control Strategy. For example, Duane defined it as the PC plant's "rules . . . of operation" and as an "overview" of how the plant runs. KBR also argues that testimony that certain *components* of the Phosgene Reactor, Oligomerization Reactor, and Steam Devolatilization Process had been publicly disclosed is fatal to Trinseo's trade secret claims. But the jury heard testimony that numerous *other* non-disclosed elements comprised these trade secrets. Viewing this evidence in the light most favorable to the verdict, a reasonable jury could find Trinseo's secrets were not generally known.

No. 24-20460

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

Here, KBR ignores the competing evidence regarding its misappropriation for each secret found by the jury. For instance, Duane testified that KBR did not have access to one particular software component of the Process Control Strategy, but that "there were elements of the process control strategy that were included in the process design" used by KBR. There was also testimony that KBR *acquired*, rather than *used*, the Phosgene Reactor technology from the Tech Team. *See id.* And, as described above, the evidence at trial suggested the Oligomerization Reactor and Steam Devolatilization Process comprised numerous elements other than what was publicly disclosed. The jury also heard testimony that KBR acquired the

No. 24-20460

Oligomerization Reactor design, which "was translated from the PDP into [KBR's] eventual engineering." The same is true of the Steam Devolatilization Process. Weighing the evidence in the light most favorable to the verdict, we find that the jury could reasonably conclude that KBR misappropriated the Process Control Strategy, Phosgene Reactor, Oligomerization Reactor, and Steam Devolatilization Process.

\* \* \*

Because sufficient evidence exists for the jury to reasonably conclude that some of Trinseo's information qualified as trade secrets and that KBR misappropriated those secrets, the district court did not err in denying KBR's motion for judgment as a matter of law concerning liability for trade secret misappropriation.

C

The Harper Defendants argue that the district court erred in denying judgment as a matter of law with respect to the jury's "alter ego" and statute of limitations findings. Again, we disagree.

1

As to the alter ego issue, the jury found "by a preponderance of the evidence that Stephen Harper is responsible for the conduct of" both SHC and PCS. The Harper Defendants argue there was insufficient evidence for the jury to reach this conclusion, and that the district court erred in finding otherwise. But the district court determined it did not need to address the alter ego issue, instead granting the Harper Defendants' motion for judgment as a matter of law only on the issue of apportionment.

Notably, the jury was charged with answering the alter ego question only *if* it awarded damages as to SHC and PCS. Because we affirm the district court's decision to vacate the damages awarded against the Harper Defendants, we need not address the alter ego issue.

24

No. 24-20460

2

Next, the Harper Defendants argue the district court erred in denying judgment as a matter of law on their limitations defense. Specifically, they assert that accrual of the limitations period under the DTSA does not require that Trinseo knew the *identity* of the misappropriator—it only requires that Trinseo knew of the *misappropriation*, which occurred by 2014.

The DTSA provides that claims must be brought within three years of "the date on which the *misappropriation* with respect to which *the action would relate* is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d) (emphasis added). In order for a claim to accrue under the DTSA, the plaintiff must have discovered the "misappropriation" as that term is defined in the statute. As discussed, the DTSA defines "misappropriation" as "acquisition of a trade secret of another *by a person who knows or has reason to know* that the trade secret was acquired by improper means." *Id.* § 1839(5)(A) (emphasis added). Alternatively, misappropriation is defined as "disclosure or use of a trade secret of another . . . *by a person who*" (1) "*used improper means* to acquire knowledge of the trade secret"; (2) "*knew or had reason to know*" the trade secret was acquired or derived by particular means; or (3) "before a material change of the position of the person, *knew or had reason to know* that" that "the trade secret was a trade secret" *and* the "knowledge of the trade secret had been acquired by accident or mistake." *Id.* § 1839(5)(B) (emphasis added).

The question here is whether Trinseo discovered, or should have discovered, the "misappropriation with respect to which [this] action would relate" before February 12, 2017. *See id.* § 1836(d). The Harper Defendants assert that three events triggered the limitations period: (1) the August 2011 SRI report, (2) the May 2014 meeting with KBR wherein Trinseo learned about "ex-Dow employees rumored to be practicing outside confidentiality boundar[ies]," and (3) the Freeport plant closure in 2014 where Harper told Duane about his consulting practice.

First, although the 2011 report may have put Trinseo on notice that SRI potentially acquired trade secret information, the evidence establishes that Trinseo quickly asked SRI to take the report down, asked about the sources, and collaborated on a revised report that did not include proprietary information. SRI told Trinseo the information was from "patents, public documents[,] and various consultants," but did not disclose the identity of those consultants. Giving deference to the jury's verdict, there is sufficient evidence that the SRI report did not cause Trinseo to discover the "misappropriation with respect to which the action" against Harper "would relate." *See id.* In other words, the jury could reasonably conclude Trinseo did not discover "acquisition of a trade secret . . . by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret . . . by a person who" either "used improper means to acquire knowledge of the trade secret" or "knew or had reason to know" the knowledge of the trade secret was derived or acquired under the circumstances prescribed by the statute. *See id.* § 1839(5).

Second, although Trinseo learned about unidentified ex-Dow employees potentially practicing outside *confidentiality* boundaries in May 2014, this does not establish as a matter of law that Trinseo learned about the *trade secret misappropriation*—as defined by the DTSA—that gave rise to Trinseo's lawsuit against Harper. Trinseo and KBR also agreed to work together to investigate the rumored ex-Dow employees, and Trinseo had a standing instruction with its employees in China "to report back relevant information." At bottom, the Harper Defendants dispute whether Trinseo's efforts give rise to "reasonable diligence"—a question of fact that was properly left to the jury. *See Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006).

Third, there is competing evidence with respect to Harper and Duane's conversation during the closure of the Freeport plant. Harper testified he told Duane he was engaged in PC consulting, but Duane recalled that Harper only mentioned consulting—not *PC* consulting. A reasonable

jury could conclude that a former employee's consulting work did not trigger a duty to investigate. *See Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 264 n.9 (5th Cir. 2014) ("[T]he limitations period does not begin to run until a plaintiff knew or should have known 'that it was wrongfully injured,' and there is nothing 'wrongful in and of itself' for employees to 'leave their employ and compete with their former employers.'" (quoting *Pressure Sys. Int'l, Inc. v. Sw. Rsch. Inst.*, 350 S.W.3d 212, 217 (Tex. App.—San Antonio 2011, pet. denied))).

The jury had a reasonable basis for concluding that Trinseo did not discover, nor could have discovered through the exercise of reasonable diligence, Harper's first alleged misappropriation before February 12, 2017. The district court did not err in denying judgment as a matter of law on the Harper Defendants' limitations defense.

## III

Trinseo asserts that the district court erred in denying its motion for a new trial on damages, arguing that the district court retroactively applied new rules of law by requiring apportionment.

"A district court has discretion to grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure when it is necessary to do so 'to prevent an injustice.'" *Seibert v. Jackson Cnty.*, 851 F.3d 430, 438 (5th Cir. 2017) (quoting *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993)). The district court's decision is reviewed for abuse of discretion. *Id.* "[R]eview of the denial of a motion for new trial is especially deferential." *Thompkins v. Belt*, 828 F.2d 298, 302 (5th Cir. 1987).

By the time Trinseo tried its case, this court had long held that "the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement . . . ." *Univ. Computing*, 504 F.2d at 535 (quoting *Int'l Indus.*, 248 F.2d at 699). *University Computing* also cited general apportionment principles. *Id.* at 537, 539. KBR raised the apportionment rule in a motion to

No. 24-20460

exclude expert testimony approximately one year before trial. In addressing KBR's argument, the district court expressly warned Trinseo—more than a month before trial and multiple times thereafter—that its "all-or-nothing approach" was a "gamble" and that the testimony of Trinseo's expert would be "totally undermined" if Trinseo failed to obtain a verdict on all ten of its alleged trade secrets. Trinseo has not shown that the district court abused its discretion by denying its motion for new trial. Nor has it shown that its decision to take the all-or-nothing approach in the face of longstanding precedent and the district court's warning warrants a new trial to prevent injustice.

IV

Next, Trinseo appeals the district court's summary judgment ruling on its misappropriation of confidential information claims, arguing that TUTSA does not preempt claims asserted in the alternative to trade secret claims.[13]

We review the grant of summary judgment de novo. *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such

---

[13] In the alternative, Trinseo asks this court to certify the question of whether TUTSA preempts common law claims for misappropriation of confidential information to the Texas Supreme Court. Because there is persuasive authority from state appellate courts that provide guidance on the issue presented, we decline to do so. *See Associated Mach. Tool Techs. v. Doosan Infracore Am., Inc.*, 745 F. App'x 535, 538 (5th Cir. 2018) (unpublished) ("We have at times, but not invariably, applied certain factors in deciding whether to certify: (1) the existence of sufficient sources of state law; (2) the degree to which considerations of comity are relevant; and (3) practical limitations.").

that a reasonable jury could return a verdict for the party opposing the motion." *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013).

The Texas Supreme Court has not addressed the extent to which TUTSA preempts misappropriation of confidential information claims premised on the same information as misappropriation of trade secret claims, so we "must make an '*Erie* guess' as to how it would do so." *Brand Servs., L.L.C. v. Irex Corp.*, 909 F.3d 151, 157 (5th Cir. 2018) (footnote omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). We first look to the "primary sources of law—here, [TUTSA]—and then to the decisions of state intermediate courts." *Brand Servs.*, 909 F.3d at 157.

A

TUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret," except that the statute does not preempt "contractual remedies," "criminal remedies," or "other civil remedies that are not based upon misappropriation of a trade secret." Tex. Civ. Prac. & Rem. Code Ann. § 134A.007. TUTSA defines a "trade secret" as "all forms and types of information" where (1) "the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret," and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 134A.002(6). As with the Uniform Trade Secrets Act (UTSA), TUTSA provides it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." *Id.* § 134A.008.

In *Brand Services*, this court interpreted the preemption provision in the Louisiana Uniform Trade Secrets Act (LUTSA), which is substantively

identical to TUTSA's preemption provision, to determine whether a common-law conversion claim for confidential information was preempted. 909 F.3d at 158–59; *compare* LA. STAT. ANN. § 51:1437 *with* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.007. We held that "the plain text of LUTSA would preclude a civilian law conversion claim involving confidential information that qualifies as a trade secret under LUTSA." *Brand Servs.*, 909 F.3d at 158. But given that "courts have come to varying conclusions about the [UTSA's] preemption provision's intended scope," this court found it necessary to "look to intermediate state court decisions" to determine whether claims premised on confidential information that is *not* a trade secret are also preempted. *Id.* Because "Louisiana appellate courts have twice held that LUTSA does not preempt where non-trade secret information was at issue," we held "LUTSA does not preempt civilian law claims for conversion of information that does not constitute a trade secret under LUTSA." *Id.* at 159.

Like LUTSA, TUTSA preempts claims premised on misappropriation of a trade secret and does not preempt "civil remedies that are *not* based upon misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE ANN. § 134A.007 (emphasis added). But the text does not answer the question of whether a plaintiff can plead misappropriation of confidential information in the alternative to a trade secret claim, where both claims are admittedly premised on the same information. And, as noted in *Brand Services*, "courts interpreting their respective states' versions of the [UTSA] have not uniformly applied UTSA's preemption provision." 909 F.3d at 158. Under these circumstances, it is appropriate also to look to Texas intermediate court decisions. *See id.*

B

Texas intermediate courts have consistently held that "a common law claim is preempted by TUTSA when the gravamen of the claim duplicates a TUTSA claim." *Reynolds v. Sanchez Oil & Gas Corp.*, No. 01-18-00940-CV, 2023 WL 8262764, at *16 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023,

no pet.) (finding that breach of fiduciary duty claims were preempted to the extent based on misappropriation of trade secrets *and* confidential information); *see also Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.) (holding that breach of fiduciary duty claims premised on confidential and proprietary information were preempted because they "duplicate[d] [the plaintiff's] alleged violation of [TUTSA]"); *Title Source, Inc. v. HouseCanary, Inc.*, 612 S.W.3d 517, 533 (Tex. App.—San Antonio 2020, pet. denied) (vacating a jury's fraud finding and holding the claim was preempted to the extent the "foundation" of the claim was "an assertion that [the defendant] misappropriated [the plaintiff's] trade secrets"); *Coe v. DNOW LP*, 718 S.W.3d 338, 354–55, 369–70 (Tex. App.—Houston [14th Dist.] 2025, pet. filed) (holding that a civil conspiracy theory of trade secret liability, as well as fiduciary duty claims premised on trade secret misappropriation, were preempted). In other words, TUTSA "preempts claims that rely on the same facts as a trade-secret-misappropriation claim . . . ." *Coe*, 718 S.W.3d at 353.

In determining whether a claim is preempted, Texas courts look to "the substance of the facts alleged rather than to the way a claim is pleaded." *Id.* at 355. For instance, even where a claim is premised on "confidential information" rather than trade secrets, that claim is preempted if "as pleaded" by the plaintiffs, "the confidential and proprietary information at issue . . . falls within TUTSA's definition of a trade secret." *Reynolds*, 2023 WL 8262764, at *18. "[A]s the Supreme Court of Texas has recognized in other contexts, 'the law should not reward artful pleading.'" *Coe*, 718 S.W.3d at 354 (quoting *Pitts v. Rivas*, 709 S.W.3d 517, 525 (Tex. 2025)).

Here, Trinseo asserted its misappropriation of confidential information claims in the "alternative" and based those claims entirely on the information that it alleged constituted trade secrets. Looking to the substance of the claims, Trinseo alleged that it used the confidential information in its business, which provided "an opportunity to obtain an

advantage over competitors." Trinseo further asserted that it "owned this confidential information and took reasonable steps under the circumstances to keep that information substantially secret." A Texas intermediate court has determined that nearly identical allegations "show[ed] that even the confidential and proprietary information at issue ... derives independent economic value from not being generally known or readily ascertainable by proper means and is the subject of reasonable efforts to maintain its secrecy." *See Reynolds*, 2023 WL 8262764, at *18 (citing Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6)). In other words, "as pleaded" by Trinseo, even the information that it alleges is confidential "falls within TUTSA's definition of a trade secret." *See id.* And regardless of the labels chosen by Trinseo, the substance of its common law claims "duplicate" its trade secret claims. *See Super Starr*, 531 S.W.3d at 843. Because Trinseo's misappropriation of confidential information claims "rely on the same facts as [its] trade-secret-misappropriation claim[s]," those claims are preempted by TUTSA. *See Coe*, 718 S.W.3d at 353.

The district court did not err in granting summary judgment on Trinseo's misappropriation of confidential information claims.

V

Finally, KBR appeals the district court's grant of a permanent injunction, arguing that Trinseo failed to establish the necessary elements to obtain injunctive relief.

A grant of a permanent injunction is reviewed for abuse of discretion. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 308 (5th Cir. 2023). "The district court abuses its discretion if it '(1) relies on clearly erroneous factual findings ... , (2) relies on erroneous conclusions of law ... , or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 284 (5th Cir. 2025) (quoting *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, 973 F.3d 326, 333–34 (5th Cir. 2020)). "The

district court's order is entitled to deference, but we review de novo any questions of law underlying the decision." *BNSF Ry. Co.*, 973 F.3d at 334.

To obtain a permanent injunction, a plaintiff must establish:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As to the first factor, Trinseo has demonstrated it will suffer harm by the continued use of its trade secrets. For example, Trinseo presented evidence that it decided to slow down its PC licensing efforts to avoid "get[ting] additional interfacial [PC] into the market" because doing so may have an "effect on the market." But KBR plans to continue putting Dow-like PC technology in the market by opening additional plants. This threat of disclosure constitutes irreparable harm.[14] *See Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336 (5th Cir. 2013) (unpublished) (noting that, under Texas law, the threat of trade secret disclosure constitutes irreparable injury).

As to the second factor, KBR argues Trinseo had an adequate remedy at law because monetary damages would sufficiently compensate for

---

[14] KBR argues Trinseo has not demonstrated irreparable harm because it delayed seeking injunctive relief until after trial and because Trinseo long ago exited the PC business. Delay in seeking an injunction may be one factor that weighs against granting an injunction, but it is not determinative. *See Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (finding that the movant's three-month delay in seeking injunctive relief "is not determinative of whether relief should be granted"). Regardless, Trinseo contemplated seeking injunctive relief from the beginning of its lawsuit, as its second amended complaint includes a request for a permanent injunction. Trinseo also has not wholly exited the PC market, as evidenced by its November 2024 PC licensing deal with a company in India.

Trinseo's injuries caused by KBR's misappropriation. But ample evidence at trial showed KBR intended to continue licensing its PCMax technology. A monetary remedy would not be adequate to protect Trinseo from that future harm.

For the balance of hardships, KBR complains about costs or inconvenience associated with complying with an injunction. But "when the potential harm to each party is weighed, a party can hardly claim to be harmed where it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Texas v. United States*, 809 F.3d 134, 187 n.203 (5th Cir. 2015) (citation modified) (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004)). And Trinseo presented evidence that KBR's continued trade secret misappropriation is harmful because it devalues Trinseo's PC technology.

On the final factor, protection against the misappropriation of trade secrets serves the public interest. *See Aspen Tech.*, 569 F. App'x at 273 (affirming the grant of a permanent injunction in a trade secret case in part because "it was in the interest of public policy to prohibit the sale and use of [the defendant's] products . . . that were derived from the improper misappropriation of trade secrets"). It serves the public interest to protect against KBR's further misappropriation of Trinseo's secrets.

The district court did not abuse its discretion in granting the permanent injunction.

\* \* \*

The district court's judgment is in all respects AFFIRMED.